UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

HECTOR L. VALENTIN

Plaintiff, Pro Se

-vs-

FILED

MAY − 3 2011

MICHAEL J. ROEMER, CLERK

**11 CV 6238**

COMPLAINT
Civ. No:

Jury Trial Demanded

CITY OF ROCHESTER, CHIEF OF POLICE JAMES SHEPPARD, FORMER CHIEF OF
POLICE DAVID MOORE, ROCHESTER POLICE DEPARTMENT, ROCHESTER POLICE
DEPARTMENT OFFICER/INVESTIGATOR MICHAEL COTSWORTH, INVESTIGATOR
DAVE MACE, INVESTIGATOR JOSEPH MURPHY, INVESTIGATOR PAUL WALTHER,
INVESTIGATOR BLAHO, OFFICER ADORANTE, OFFICER HOLMES, FORMER
ROCHESTER POLICE DEPARTMENT OFFICER HOKE
MONROE COUNTY, MONROE COUNTY DISTRICT ATTORNEY'S OFFICE, MONROE
COUNTY DISTRICT ATTORNEY MICHAEL GREEN, FORMER MONROE COUNTY
DISTRICT ATTORNEY HOWARD RELIN, FORMER MONROE COUNTY ASSISTANT
DISTRICK ATTORNEY DANIEL MAJCHRZAK, MONROE COUNTY ASSISTANT
DISTRICT ATTORNEYS PATRICK FIERRO, JOHN MUNRO AND JOHN MARCHIONI,
MONROE COUNTY DISTRICT ATTORNEY'S OFFICE EMPLOYEES MS. WENDY SISCA
AND INVESTIGATOR CASPER CACECI;

Defendants.

---

Plaintiff Hector L. Valentin acting Pro Se brings this civil rights action against

Defendants, City of Rochester, Chief of Police James Sheppard, former Chief of

Police David Moore, Rochester Police Department, Rochester Police Department

Officer/Investigator Michael Cotsworth, Investigator David Mace, Investigator

Joseph Murphy, Investigator Paul Walther, Investigator Blaho, Officer Adorante,

Officer Holmes and former Rochester Police Department Officer Hoke, Monroe

County, Monroe County District Attorney's Office, Monroe County District

Attorney Michael Green, former Monroe County District Attorney Howard Relin,

former Monroe County Assistant District Attorney Daniel Majchrzak, Monroe

County Assistant District Attorneys Patrick Fierro, John Munro and John

Marchioni, Monroe County District Attorney's Office employees Ms.Wendy

Sisca and Monroe County Investigator Casper Caceci.

1

## Statement of Complaint

The **Fifth** Amendment **states** "no person shall be **deprived** of life, **liberty**, or property, without **due process of law** and this Federal Constitutional **civil right** was **extended** to include the **states** by the **Fourteenth** Amendment in 1868.

This Complaint **alleges** that the above named **defendants** acted with **reckless disregard** and under the **color of law, committed** one or more **Brady** violations with their **failure** to disclose this **Brady** material in their **possession** and **control** to my **defense**.

As a result of the **failure** of the named **defendants** in this Complaint to **disclose** this **Brady** information that they knew or should have known was **favorable** to my defense and **material** to the **outcome** of my **trial**, I was **denied** my **Fifth** and **Fourteenth** Amendment **civil rights** to a **fair trial** without **due process of law** that led to my **false imprisonment** and **loss of liberty** for 6 years.

I respectfully contend that the specific **illegal actions** by **each** named defendant in this Complaint are as follows:

1) ADA Daniel Majchrzak, the chief prosecutor was **charged** with a **Brady** violation on the **suppression** of John Kemp's criminal records in the New York State Appellate Court decision **(People v Valentin)** and in my Federal Habeas Corpus Grant **(Valentin v Mazzuca)**.

a) In the Habeas Corpus grant, the Federal Magistrate judge **ruled** that ADA Daniel Majchrzak committed a **Brady violation** by **withholding** information that was **favorable** to my defense and **material** to the **outcome** of my trial.

b) He also ruled that the prosecutor's illegal action **violated** my Constitutional **civil rights** to a **fair trial and due process of law** and **expunged** my **convictions**.

2) In my Complaint, I respectfully contend that ADA Daniel Majchrzak **committed** two additional **Brady** violations in his **suppression** of the criminal records of Terrance McLaurin and Sarah Bower's pending criminal action that he

2

knew or should have known were in his **possession** and **control** and **failed** to disclose this **Brady** material to my **defense**.

a) In this Complaint, I respectfully contend that ADA Daniel Majchrzak **engaged** in a **malicious prosecution** with his use of the discredited brain damaged convicted child molester John Kemp who was willing to **change** his story and **perjured** himself at my **trial**.

b) In addition, I respectfully contend that ADA Daniel Majcrhzak **continued** his malicious prosecution and **suborned** the perjury of his key eyewitness with his failure to **correct** John Kemp's **perjured** testimony and **improperly** and **personally vouched** for the **credibility** of his key eyewitness during his **redirect** and **closing** argument.

c) I respectfully contend that ADA Daniel Majchrzak again **expanded** his malicious prosecution with his **use** of the material witness Sarah Bower who also **perjured** herself at my trial and **accused** me of stealing car **speakers** that were **never** reported **stolen** from the store etc.

d) Furthermore, I respectfully contend that ADA Daniel Majchrzak **made** false and misleading **statements** at my **trial** to the **court** and **jury** that were **not supported** by the facts, proof and evidence at my trial.

2) I respectfully contend that Howard Relin, the former District Attorney and ADA Majchrzak's supervisor also **committed** a **Brady** violation when he **failed** to **turn over** to my defense Sarah Bower's prosecution **records** that were in his **possession and control**.

a) I respectfully contend that Mr. Relin **engaged** in a cover up and had a conflict of interest when he **failed** to **conduct** an internal **investigation** when ADA Daniel Majchrzak's **extensive** and **egregious misconduct** and use of **perjured** witness testimony was **brought** to his attention.

b) I respectfully contend that Mr. Relin improperly **vouched** for the **credibility** of **Sarah Bower** in his letter to Mr. Rolfe without first **checking** her

3

**veracity** and prosecution **records** that were in **his possession** and **control** that his **credibility** information on her was **correct**.

c) I respectfully contend that Mr. Relin knew or should have known of the **illegal actions** of his **former** employees that **denied** my defense of any **Brady** information that was **material** to the **outcome** of my **trial** and **failed** to **correct** it.

d) Mr. Relin is also **relevant** to this Complaint and was **responsible** at the time of these violations for the policies, practices and customs of all **former** employees at the Monroe County District Attorney's Office.

3) I respectfully contend that the current District Attorney Michael Green knew or should have known of the **illegal** actions of his **employees** and **former employees** and **failed** to **correct** it.

a) Mr. Green is also **relevant** to this Complaint and **responsible** for the policies, practices and customs of all past and present employees at the Monroe County District Attorney's Office that also **denied** my defense of any favorable **Brady** information that was **material** to the **outcome** of my trial and has occurred after his election in 2004 and has continued up to the present time and date.

4) I respectfully contend that ADA John Munro who covered for Mr. Majchrzak at my Wade and Huntley hearing **committed** a **Brady** violation when he knew or should have known of John Kemp's **criminal records** that were in his **possession and control** when he **failed** to honor his ongoing **Brady** obligations and disclose this **Brady** material to **ADA Majchrzak** and my **defense**.

5) I respectfully contend that ADA Patrick Fierro who fought my appeal **committed** a **Brady** violation when he knew or should have known of Sarah Bower's **pending criminal action** and her **prosecution** by his **office** that were in his **possession** and **control** when he **failed** to honor his ongoing **Brady** obligations and **disclose** this Brady material to my **defense**.

6) I respectfully contend that ADA John Marchioni who prosecuted Sarah Bower on the **petit larceny** charge **committed** a **Brady** violation when he knew or should have known of Sarah Bower's **involvement** in my case and her **theft**

4

that were in his **possession** and **control** and **failed** to **honor** his ongoing **Brady** obligation and disclose this **Brady** material to Mr. Majchrzak and my **defense**.

7) I respectfully contend that the Monroe County District Attorney's Investigator Casper Caceci was acting in the role of a **police investigator** when he was assigned to investigate the robbery incident on Dewey Avenue and track down the **whereabouts** of another eyewitness Terrance McLaurin.

a) I respectfully contend that Investigator Caceci **committed** a **Brady** violation when he knew or should have known of the **criminal records** of John Kemp and Terrance McLaurin and the **pending** criminal action against Sarah Bower that were in **his possession** and **control** and **failed** to **honor** his **ongoing Brady** obligation and **disclose** this Brady material to Mr. Majchrzak and my **defense**.

8) I respectfully contend that Ms. Sisca another employee of the same office acted in the role of a police **investigator** when she was assigned to track down the **whereabouts** of the material witness Sarah Bower.

a) I respectfully contend that Ms Sisca **committed** a **Brady** violation when she knew or should have known of Ms. Bower's **pending criminal action** from her police investigative **involvement** in my case that were in her **possession** and **control** and **failed** to **disclose** this Brady material to ADA Majchrzak and my **defense**.

9) I respectfully contend that Officer/Investigator Michael Cotsworth who was one of ADA Daniel Mahchrzak **key** police investigators **committed** a **Brady** violation when he knew or should have known of the **criminal records** of John Kemp, Terrance McLaurin and Sarah Bower's **pending criminal action** with his **local** office **(Highland Police Office)** that were in his **possession** and control and **failed** to honor his **Brady** obligations and **disclose** this **Brady** material to ADA Majchrzak and my **defense**.

a) In addition, I respectfully contend that Investigator/Officer Michael Cotsworth **violated** official police **policy** when he **failed** to make an **arrest** on

5

Sarah Bower for his **local** office **(Highland Police Office) pending criminal action** charge against her when he knew or should have known she would make an **appearance** right after **his** testimony at my **trial**.

10) I respectfully contend that the other **police** members on ADA Majchrzak's **team** which included Investigators Mace, Murphy and Walther also **committed** a **Brady** violation when they knew or should have known of the **criminal records** of John Kemp, Terrance McLaurin and Sarah Bower's **pending criminal action** that were in their **possession** and **control** and **failed** to **disclose** this **Brady** material to ADA Majchrzak and my **defense**.

11) I respectfully contend that other police officers including Officer Hoke and Adorante that worked with Investigator/Officer Michael Cotswoth at the Highland Police office **committed** a **Brady** violation when they knew or should have known of the **criminal records** of John Kemp, Terrance McLaurin and Sarah Bower's **pending criminal action** that were in their **possession** and **control** and **failed** to disclose this **Brady** material to ADA Majchrzak and **my defense**.

12) I respectfully contend that Investigator Blaho and Officer Holmes who were also involved in the investigation of the robbery incident on Dewey Avenue **committed** a **Brady** violation when they knew or should have known of the **criminal records** of John Kemp, Terrance McLaurin and Sarah Bower's **pending criminal action** that were in their **possession** and **control** and **failed** to **disclose** this **Brady** material to ADA Majchrzak and my **defense**.

13) I respectfully contend that the former Rochester Police Department Chief of Police David Moore knew or should have known of the **illegal actions** of his employees' and **failed** to **correct** them.

a) I also respectfully contend that former Chief of Police David Moore is **relevant** to this Complaint and was **responsible** for the policies, practices and customs of all **employees** of the Rochester Police Department and bears **full** responsibility for the **illegal actions** of his **former** and **current** employees who have all **failed** up to this time and date to **turn** over any **Brady** material in their

6

**possession** and **control** to my defense that was **favorable** and **material** to the **outcome** of my **trial** and **ongoing** litigation.

14) I respectfully contend that the current Rochester Police Department Chief of Police James Sheppard knew or should have known of the **illegal actions** of his **employees'** and **failed** to correct them.

a) I respectfully contend that Chief of Police James Sheppard is also **relevant** to this Complaint and is **responsible** for the policies, practices and customs of all **employees** of the Rochester Police Department and **bears full responsibility** for the **illegal actions** of his **current** and **former** employees who have all **failed** up to this time and date to **turn over** any favorable **Brady** material to my **defense** that was **favorable** and **material** to the **outcome** of my trial and **ongoing** litigation.

As a result of the above **illegal** actions of the **defendant's** named in this Complaint, I respectfully contend Constitutional **violations** of my **due process of law civil rights** under 42 U.S.C. 1983, 42 U.S.C.1985, 42 U.S.C. 1986 and U.S.C 1988 and **seeks** redress for these **violations** for the **deprivation** of my clearly established **Fifth** and **Fourteenth** Amendment **civil rights** that led to my **false imprisonment** for six years.

Per my **Complaint** and **Habeas Corpus Grant** 05-CV-298VEB, the Plaintiff Hector L. Valentin **brings** this action to **recover** compensatory and punitive damages for the above **Constitutional violations** to my **due process of law civil rights** pursuant to 42 U.S.C. 1983, declaratory, injunctive and equitable relief pursuant to 28 U.S.C. 2201 and 2202, costs and attorney's fees pursuant to 42 U.S.C. 1988 and Fed.R.Civ.P.54.

## Jurisdiction of Complaint

Jurisdiction for this Complaint is invoked pursuant to 28 U.S.C. 1331 and 1332 (federal question) and 1343 civil rights.

**Venue**

This action properly resides in the Western District of New York pursuant to
28 U.S.C. 1343(3) because the Habeas Corpus Grant was decided in the Western
District, the claims arose in this judicial district and all defendants live or do
business in Monroe County.

**Overview of the Facts and Issues Raised in this Complaint**

1) This Complaint will **show** by the **following information** and **Exhibits** that
Assistant District Attorney Daniel Majchrzak and other Assistant District
Attorneys, administrative and investigative staff named as defendants in this
Complaint knew or should have known that their **illegal actions** of committing
one or more **Brady** violations, hiding or suppressing everything favorable to my
defense that was **material** to the **outcome** of my trial violated my **Constitutional**
due process **civil rights** to a **fair trial** and **due process of law**.

2) This Complaint will **show** by the following information and Exhibits that
ADA Daniel Majchrzak acted with **reckless** disregard to my **civil rights**
**conducted** a **malicious prosecution** against me using **perjured eyewitness**
**testimony** that he knew or should have known to be **false** and **suborned** this
perjury by his **failure** to **correct** it.

3) This Complaint will **show** by the following information and Exhibits that
the Rochester Police Department and the prosecutor's police team named as
defendants in this Complaint knew or should have known of **each other illegal**
**actions** that hid or suppressed **Brady** information that was **favorable** to my
defense and **material** to the **outcome** of my **trial**.

a) This Complaint will also **show** by the following information and Exhibits
that the Rochester Police Department and the prosecutor's police team named as
defendants in this Complaint **acted** with reckless disregard to my **civil rights**,

8

**committed** one or more **Brady** Violations and **participated** in a **cover up** of **silence** that violated my Constitutional civil rights to a **fair trial** without **due process of law**.

4) This Complaint will **show** by the following information and Exhibits that ADA Daniel Majchrzak **assumed** the **role** and **preformed** the duties of a **police investigator** in his prosecutions of my case and the related Arroyo case.

5) This Complaint will **show** by the following information and Exhibits that all named defendants in this Complaint were **employed** by **the Monroe County District Attorney's Office** and the **Rochester Police Department** and acted under the color of law and or were acting in their official duties, **supported** the **illegal actions** of ADA Daniel Majchrzak in his **malicious prosecution** that led to **my false imprisonment** and **loss of liberty** for six years.

6) This Complaint will **show** by the following information and Exhibits that the named defendants in this Complaint knew or should have known that their **failure** to honor their **Brady** obligations and their ethical **obligations** as stated in their Organization's Ethical Code **policy** committed **illegal actions** that **deprived** me of my **Constitutional** due process **civil rights** to a **fair trial** and **due process of law** and to be **free** from malicious prosecution and false imprisonment as **guaranteed** under the Fifth and Fourteenth Amendments.

All named defendants in this Complaint were employed at the time of these violations at the **Monroe County District Attorney's Office** under the **supervision** of former Monroe County District Attorney **Howard Relin**.

All named police defendants were employed at the time of theses violations at the **Rochester Police Department** under the **supervision** of the former Chief of Police **David Moore**.

In this Complaint, all **facts and contentions** supporting my civil rights violation claims' are included as **Exhibits** and are summarized in **List and History of Exhibits In Complaint** pages and are included as a separate **attachment** to this Complaint.

9

These **Exhibits** consist of official court transcripts, official police reports, official correspondence, personal mail, email and other pertinent information and are documented in the following **twenty-four sections** of this Complaint.

### I. John Kemp's Participation

On February 29th, 2000, a stereo shop on Dewey Ave was robbed. Two eyewitnesses were present, Terrance McLaurin the storekeeper and John Kemp an acquaintance of McLaurin.

During the following police investigation, John Kemp **indicated** that he could identify the suspects and was transported within one hour after the robbery to the Maple Section Police Office.

At the police station, John Kemp was asked to **view** a MoRis photo array. After viewing photographs of various individuals, John Kemp made a positive **identification** on one photo that he identified as the **gunman**.

On or about Aug or Sept 2000, at his suppression hearing before Justice Kenneth Fisher, John Kemp **testified** that the man he positively **identified** as the **gunman** in his three Rochester Police Department **reports** was Jose Arroyo.

At Mr. Kemp's suppression hearing, Justice Fisher found him **not** to be **credible** and wrote a **Decision** and **Order** on his findings.

Upon information and belief, my source being **Justice Fisher's** Decision and Order **(Exhibit 1, Page 1 and 2)** dated on November 20, 2000.

In this decision, Justice Fisher **ruled** that "Mr. Kemp **did not** provide clear and convincing evidence that he has an independent basis for making an in court identification. Furthermore, **he probably should not be sworn to testify at trial**."

Also in this decision, Justice Fisher's **agreed** with the defense that "Mr. Kemp **cannot** give a **reasonable** accurate **account** of what he has seen and heard vis-à-vis the subject about which he .....was **examined** at the **hearing**."

Justice Fisher further stated "**He simply could not describe what occurred at the shop with any consistency**, and he gave little or no confidence in the reliability what he did describe consistently."

As a result, Jose Arroyo's case **was dismissed** and I was released and instructed to attend a Wade and Huntley hearing on October 27, 2000.

Judge Geraci who knew of the Justice Fisher **ruling** on John Kemp's **credibility** allowed him to testify at my Wade and Huntley hearing.

At this hearing, ADA John Munro who was covering for Mr. Majchrzak introduced John Kemp to Judge Geraci.

I respectfully contend that ADA Munro knew or should have known of John Kemp's **criminal records** and **informed** Mr. Majchrzak and my **defense** of this **Brady** material **before** my trial.

I respectfully contend that ADA Munro's **failure** to honor his **Brady** obligations **resulted** in another **Brady violation** that violated my Constitutional rights to a fair trial and due process of law.

In addition, John Kemp at this hearing **falsely accused** me of threatening him at Midtown Plaza during the recess. I **testified** on the stand that I **did not** threaten Mr. Kemp and was at Midtown shopping and **showed** my receipts as proof.

Despite the fact that Judge Geraci also **knew** of the Justice Fisher's **ruling** on John Kemp that **raised** serious problems with his **credibility** and that he probably **should not** be sworn to **testify** at trial. Judge Geraci **believed** John Kemp's story and **revoked** my bail.

I was immediately **remanded** back to the Monroe County jail until my **trial** on January 9 through the 11th, 2001 solely on the **false accusations** and **word** of John Kemp.

As a result of this **unjust imprisonment** just **before** my trial, my ability to mount a proper **defense** for my upcoming **trial** was severely **impaired** and **prejudiced** my **due process of law civil rights**.

11

## II. Motion for Discovery

Before the trial, my defense attorney Mr. Dudley Bertram filed an omnibus Motion for **all discovery materials** and anything that **can be discovered**.

Although Mr. Bertram did not **specifically** asked for any pending criminal action or the ADA's witnesses criminal histories, the **Brady Rule and its related rulings** that anything **favorable and material** including the **criminal records of John Kemp** and the **pending criminal charge against Sarah Bower must be disclosed by the prosecutor** as well as the **police** to the **defense** and this disclosure **applies** under a general request **or no request at all.**

When this rule is **violated** by the **prosecutor** and the **police** and **affects** the **outcome** of a trial leading to false conviction and imprisonment; the **Constitutional** due process **civil rights** of the **defendant** to a **fair trial** and **due process of law** and to be free from **malicious prosecution** and **false imprisonment** are **violated** under the **Fifth** and **Fourteenth** Amendments.

## III. John Kemp's Three Police Statements

At my trial on January 9-11, 2001, Mr. Kemp changed his story and was allowed to testify as the prosecution's **key** eyewitness that I was now the **gunman contradicting** his previous **Justice Fisher** court identification and his **three police statements** he made to the **Rochester Police Department**.

John Kemp confirmed his positive identification to **(Officers Holmes and Investigator Murphy)** in his three separate police reports that identified Jose Arroyo as the number one suspect **(gunman)** in **his photo identification**:

1) Police report dated February 29, 2000 by **Officer Holmes** who wrote Kemp's statement, "Kemp said he could **identify** the suspects and Kemp was **transported** to the **Maple Section Office**. He viewed suspects matching the

12

description he gave. Kemp said the **person** bearing Moris #228079 **as the man who robbed the store that carried the handgun**. Moris #228079 is **assigned** to Jose Arroyo".

2) Defense Exhibit A-Police report dated March 1, 2000 by **Investigator Murphy** who wrote Kemp's statement, "The Hispanic male pulled a gun out, etc." "**I positively identified** etc". "Investigator Murphy **told me the person I identified as named Jose Arroyo**."

3) Police report dated March 2, 2000 by **Investigator Murphy** who wrote Kemp's statement. "In conversation with this witness about the incident **he recalled the suspect (Arroyo) that he identified** coming into the shop twice on the day of the robbery. He stated that just prior to **suspect (Arroyo) pulling the gun out** etc, etc."

Note-In section V-John Kemp testified at my trial and denied that he identified Jose Arroyo as the gunman in his police reports and testified that the police put things in his reports that he didn't say.

### IV. John Kemp's Court Statements to Justice Kenneth Fisher

The following is John Kemp's transcription **statements** to Justice Fisher that are related to what he **told** Justice Fisher on who was the **gunman** and to what he **testified** at my trial:

Q: **Justice Fisher:** "And do you recall how it was as you were viewing the monitor **that you came to pick out an individual as the person who had the gun?**"

A: **John Kemp:** "Yeah. What happened was is it pumps up a picture. If it's not it, I forget how you do it, and go to the next picture, and just go through a random thing and came to it. **I said -- I said there it is (photo of Arroyo).** I will save, push the button to the save the picture, and I went out and got the **officer** that is out the room there and I said, **I said this is**

**the picture right here. He (officer) said okay, hold on, and they went and got another officer and he said -- came in and wrote all the information down**." (Page 64 and 65, Jose Arroyo Suppression Transcript, September or October 2000)

In the above-transcribed **statements** John Kemp **confirmed** to Justice Fisher **his** MoRis **identification** of Jose Arroyo as the **gunman** and also **his police reports**.

Note-In section V-When John Kemp testified at my trial, he denied the above statement he made to Justice Fisher that he identified Jose Arroyo as the gunman.

### V. John Kemp's Inconsistent Trial Testimony

The following is **transcribed excerpts** of John Kemp's **contradictory** court testimony to what he **testified** at the Justice Fisher **hearing**, what he told the **police** and what he **testified** about at my **trial**:

1. Page 281 and 282, Trial Transcript (Bertram's cross-examination of John Kemp):

   Q. Was this photograph **identified** by you as a photograph of the **gunman**?

   A. **I never said the person that was in the photograph was the gunman.**

   Q. Was it a photograph of the gunman that you look at?

   A. **No**.

   Q. It wasn't?

   A. I don't recall, it been so many months -- it's been over a year.

   Q. You never said it was a photograph of the gunman?

   A. I don't recall.

   Q. And are you saying today that the photograph you saw was **not** the gunman.

   A. **I'm not saying that.**

   Q. Well, what are you saying? **Was it or wasn't it**?

   A. I don't -- remember what photograph I picked out of the hundreds I seen?

Q. **Have you ever said on any occasion** that the photograph you picked out was a photograph of the gunman?

A. **I don't believe so.**

2. Page 282 and 283, Trial Transcript (Bertram's cross-examination of John Kemp):

Q. **Did anybody tell you**?

A. No, only way I found out the person's name was after I got the picture out of the computer and the **investigator** said who the person was.

Q. So you picked out the photograph, **you didn't tell the investigator who the person was**?

A. **Correct**

Q. The investigator told you who it was.

A. This was what happened: he brought me --

Q. Just yes or no.

A. He brought me the pictures that I picked out and he said which ones --these look similar to the person who was involved in the incident? So I picked out one that's when I found out who the person's name was.

Q. The officer told you the person's name?

A. It was in the report that I read.

Q. Did the Officer tell you the person's name?

A. **No**, it was in the report that I read.

3. Page 283 and 284, Trial Transcript (Bertram's cross-examination of John Kemp):

Q. Now, Mr. Kemp. I want you to look at this. This has been marked as Defendant's Exhibit A, and tell me if you recognize it.

A. **It's the statement I gave**.

Q. Would you like to read for us the last sentence in your **statement**?

A. I can't read that, its pretty messed up handwriting here.

Q. Well, were you able to read it --did you **sign** it after the police took it?

A. Yeah, but the person --

Q. Were you able to read it on the day you sign it after the police took it?

A.  Um -- as I was talking he was doing this --

Q. Were you able to read it on the day you signed it?

A. Yes, I also wear glasses, too.

Q. But you can't read it today?

A.  I also wear glasses, too. I didn't know I had to bring them to read.

Q.  Would you like me to read it to you?

A.  Sure.

Q. **It says, Investigator Murphy told me the person that I identified was named Jose Arroyo.**

A.  **Correct**.

4. Page 286, Trial Transcript (Bertram's cross-examination of John Kemp):

Q. Yeah. And did you say in your **police statement** to the police that the person you **identified** was stated by the officer to you as being **Jose Arroyo**?

A. **Yes, as one of the parties, not the gunman**.

5. Page 297 and 298, Trial Transcript (Bertram's cross-examination of John Kemp):

Q. Now since after this incident (robbery) took place --

A. Uh-huh.

Q. -- did you ever see **number two** (Arroyo) **again**?

A. **No**.

Q. You have never seen person number two (Arroyo) again up to this day?

A. **All depends. No**.

Q. Now you state that categorically. You stand by that answer?

A. I feel that this is a trick question. I don't understand --

Q. No, I just want to know, that you're sure of what you're saying, Mr. Kemp. Since that incident happened in February of last year, have you ever set **eyes** on person number two (Arroyo) **again**?

A. **No**, only in court, that's it.

Q. **In court where**?

A. Ah – **no, not number two** (Arroyo). **I've only seen number one (Valentin) that was it**. I never seen **number two** (Arroyo) after the incident, **even out of all the court proceedings, I never seen the second person** (Arroyo).

Q. You **never** seen person **number two** (Arroyo)?

A. **No**.

Q. Now when you went before Justice Fisher at that hearing --

A. **Correct**.

Q. -- was there a **defendant** (Arroyo) in court **ther**e?

A. Correct.

Q. And who was that person (Arroyo)? Number two (accomplice) or number one (gunman)?

A. Can you restate that?

Q. All right? Was there a **defendant** (Arroyo) in that court?

A. **Yes**.

Q. And I asked you, was that person (Arroyo) number two (accomplice) or number one (gunman)?

A. **Number two (accomplice)**.

6. Page 299 and 300, Trial Transcript (Bertram's cross-examination of John Kemp):

Q. Person **number two** (Arroyo), **good**. Now I ask you, did you know the name of that person when you went before Justice Fisher.

A. **No, I did not**.

Q. No one told you who it was?

A. They may have said it, I don't listen to everything they say, so -- I don't remember names.

Q. So you were going to **testify** about somebody who you didn't know **who it was**?

A. The person's name --

Q. So you **did not know** the **name** of the person you were going to **testify**   about?

A. I believe his name was **Jose Arroyo** or something like that.

7. Page 323, Trial Transcript (Bertram's cross-examination of John Kemp):

Q. The police **put things** in your **statement** that you **didn't say** and you **signed** it without **reading it**?

A. **Yes.**

I respectfully contend that John Kemp's **above** inconsistent and contradictory trial testimony on **who was the gunman** supports my **perjury claim** that he did not **testify** truthfully at my **trial**.

## VI. ADA Majchrzak's Redirect Statements Supporting John Kemp's Inconsistent Trial Testimony

1. Page 324 and 325, Trial Transcript (Majchrzak's **redirect** of John Kemp):

Q. Mr. Kemp, I **need** to clear this up. **This is very important**. These **questions** about what **happened in front of Justice Fisher**, okay, the **two times** that--

Q, When Mr. Bertram says you **told** Fisher that that **picture** was the **gunman**, was it **Fisher that said it or you that said it**?

A. **I never said it was the gunman, I never--**

Q. So who in that court proceeding **said** the **person** in the **picture** that you were looking at was the **gunman**, was it **you or Fisher**?

A. **Fisher**

Mr. Majchrzak: All right. **That's all I need to settle**.

Mr. Bertram: Q. Do you agree with him?

Mr. Majchrzak: A. **Not me, Fisher**?

Mr. Bertram: Q. Yeah, did you **agree** with **Fisher**?

Mr. Kemp: A. **Yes**

2. Page 314, Trial Transcript (Majchrzak's Redirect of John Kemp):

**Q.** Did part of the statement that you **signed** state, **I positively identified a photo as the guy who robbed Terrance in the stereo shop on Dewey Avenue?**

18

A. **Correct**.

Q. **Okay. When you -- now that's in the statement.** What did you **mean** by that? Well, first of all, let me **stop** you there before you answer that. **Who wrote this statement out?**

A. Um, **Investigator Murphy**.

Q. Okay, **not you?**

A. **Not me**.

I respectfully contend that the above-transcribed trial testimony shows that John Kemp **again perjured himself** during the prosecutor's **redirect** and **shows** that Mr. Majchrzak **suborned** Mr. Kemp's perjury by **blaming** Kemp's previous **inconsistent** trial statements on **Justice Fisher** and the **police**.


## VII. Point One John Kemp's Perjury

The following points further support my contention that John Kemp **committed** perjury by testifying **contrary** to the **three police statements** he signed, **contrary** to his suppression hearing **transcripts** before Justice Fisher, and **contrary** to what Terrace McLaurin the other eyewitness **testified** about before the **grand jury**.

This contention that John Kemp **committed** perjury at my trial is **summarized** in the following statements:

1) Prior my trial, Mr. Kemp **signed** three police statements to **two** different police officers (**Holmes and Murphy**) that Jose Arroyo was the **gunman**.

2) Mr. Kemp testified **under oath** before Justice Kenneth **Fisher** and **identified** Jose Arroyo as the **gunman** and **confirmed** the **statements** he made to the **police**.

3) Mr. Kemp also **contradicted** the **testimony** of the other **eyewitness** (McLaurin) that Mr. Valentin **was not** the gunman.

4) Mr. Kemp's testimony at Mr. Valentin's trial on Jan 9th –11th, 2001 was **inconsistent** and **contradictory** to his **prior** statements:

5) Mr. Kemp **denied** under cross-examination that he **identified** a **photo** of Jose Arroyo as the **gunman** to the police.

6) Mr. Kemp gave **evasive** and **contradictory** answers to the **simple question** if anybody told him the **name** of the person he **identified**. He first **admits** that Investigator Murphy told him the name and then **denies** he heard the name by stating "No. It was in the police report that I read"

7) Mr. Kemp gave **evasive** and **contradictory** answers to the **question** if he even **signed** his own **police report**.

8) Mr. Kemp **contradicted** his police report that **stated** he **identified** Jose Arroyo as the **gunman**.

9) Mr. Kemp now claimed under cross-examination that he **told the police** that Mr. Arroyo was **one** of the parties, **not** the **gunman**.

10) Mr. Kemp gave **evasive** and **contradictory** answers to the **question** if he ever **saw** Jose Arroyo **after** the robbery.

11) He first said that he **saw** him in **court** and then said that he **never** saw him although there was a **defendant** sitting in Justice Fisher's courtroom.

12) In addition, Mr. Kemp **contradicted** the **suppression transcript** by **stating** that he **identified** Mr. Arroyo as the **accomplice** to Justice Fisher.

13) Mr. Kemp **stated** under cross-examination that he **didn't know** the **name** of the **defendant** that he testified **against** in Justice Fisher's courtroom.

14) Mr. Kemp then **stated** that he **didn't remember** names.

15) On the **next** question, Mr. Kemp is **suddenly able** to recalled Jose Arroyo's **name**.

16) Mr. Kemp **confirmed** under cross-examination that the **police put** things in his **police report** that he **never** said and he **signed** his **police report** without **reading** it.

17) This **contradicts** his two **previous statements** under cross-examination, "It was in the **police report** that **I read**" and "No. It was in the **police report** that **I read**".

20

18) Mr. Kemp's statement under cross-examination that the **police** put things in his police **report** that he **never** said **implies** that the police **falsified** their police **reports** and **committed** a very serious **crime**.

19) On Mr. Majchrzak's **redirect** regarding his **inconsistent** statements he made to Mr. Bertram, Mr. Kemp again **confirmed** that he **never identified** Jose Arroyo as the **gunman** before Justice **Fisher**.

20) Mr. Kemp also **confirmed** to Mr. Majchrzak that he positively **identified** Jose Arroyo as the **gunman** to the police after **denying** it **during** his **cross-examination**.

21) I respectfully contend that the **trial** and **suppression transcripts shows clear** and **convincing** evidence that John Kemp **testified falsely under oath** on a **material matter** that **would** have **affected the outcome** of my **trial** with a **deliberate** intent to **deceive** the **court** and **jury**.

As a **result** of John Kemp's **perjured testimony**, my **defense** that I **was not** the **gunman** was **dealt** a **fatal** blow and **denied** me any **chance** of **receiving** a **fair trial** and **due process of law**.

### VIII. Point Two ADA Majchrzak's Subornation of Mr. Kemp's Perjury

Before the trial, Mr. Majchrzak knew or should have known that he **had** a serious **credibility** problem with John Kemp when Mr. Kemp was severely **impeached** on his **prior** trial statements.

In spite of John Kemp's inconsistent **story** and **statements** that **contradicted** everything he **said before**, Mr. Majchrzak **supported** Mr. Kemp's **perjury** in his **redirect** and **closing** argument.

The following excerpts and information were taken from my trial **transcripts** and **supports** my contention that ADA Majchrzak's **suborned** the **perjury** of John Kemp:

1) Mr. Majchrzak spent **thirty-one minutes** on his **closing argument** and strongly **defended** the **inconsistent** and perjured statements made by John Kemp, saying Kemp was **accurate**, Kemp was **believable** and Kemp **inherits** the truth.

21

2) Mr. Majchrzak then **expanded** his **subornation** and also **blamed Justice Fisher** and the **police** for John Kemp's **inconsistent** statements to them by stating to the **jury** in his **closing** argument:

"**But these alleged inconsistent statements (Kemp), what were they? Were they the words that John Kemp used? No. Absolutely no evidence of that.**"

"What they were **statements** that **other** people (**Fisher and Murphy**) had **suggested** or **made** to him that they **confronted** him with, that he had to take a **position** on." "and **he (Kemp) signs, signs** it **trusting** the **police**. Is that **so wrong**, for a guy that is uninitiated in **police** investigations?"

"Again, **he never said**--where is it that says the **gunman** was Jose Arroyo? **Never did**."

3) "This **questioning** before Justice Fisher, you will recall the testimony, **not one word where John Kemp says, yes, that guy (Arroyo) was the gunman**."

"You **will never see those words in the transcript**."

"Because again, you have a **Supreme Court Justice** looking **down** on John Kemp, who got nervous, and **suggesting** to **him** something which he says **one** thing or the **other** to." (Page 469 and 470, Trial Transcript, closing argument)

4) In my Habeas Corpus Grant, Magistrate Judge Bianchini **ruled**, "The prosecutor also **improperly** and **blatantly vouched** for **Kemp's credibility**:" (Page 37, Habeas Corpus Decision and Order January 10, 2011

I respectfully contend that Mr. Majchrzak in his **redirect** and **closing** argument **statements suborned** the perjury **committed** by John Kemp at my **trial**.


## IX. Point Three ADA Majchrzak's Malicious Prosecution


I respectfully contend that the following **points** further **support** my **contentions** in this Complaint that Mr. Majchrzak's **engaged in a malicious prosecution** that **violated** my **civil rights** when he **allowed** John Kemp to

**perjure** himself, **suborned** Kemp's **perjury** and then **allowed** Sarah Bower to also **commit perjury** at my trial:

1) John Kemp's **three** police reports **directly contradicts** Mr. Majchrzak on **"where is it that says that Jose Arroyo was the gunman etc."** and **showed** that he (Majchrzak) **made** a **false** and **misleading statement** to the **jury**.

2) Mr. Majchrzak knew or should have known **what** was **in** the **police reports** before **making** this statement to the **jury** and **stating** it as the **truth**.

3) In addition, **page 64 and 65** of John Kemp's suppression hearing before Justice Fisher **directly contradicts** Mr. Majchrzak's **statement** to the **jury** that **they** will **never see** those **words** in the **transcripts**. In fact, page 64 and 65 **clearly shows** that John Kemp **confirmed** to Justice Fisher his police identification of Jose Arroyo as the **gunman**.

4) Also, Mr. Kemp was Mr. Majchrzak **key eyewitness** at the Jose Arroyo **suppression** hearing and was there **to testify that Arroyo was the number one suspect (gunman)**.

5) Mr. Kemp also **told** Public Defender Mary Davison under cross-examination at his **suppression** hearing, "I got a **good look** at him (Arroyo). So, if the **police** said can **you identify**, I could say **yes**." (Page 49, Jose Arroyo Suppression Transcript)

6) Again, Mr. Majchrzak who was the same **prosecutor** on the Arroyo case was **present** at John Kemp's **suppression** hearing before Justice Fisher and **knew** or should have **known** what John Kemp **testified** about.

7) Also, Mr. Majchrzak **knew** or should have **known** that his **statement**, "You will **never** see those **words** in the **transcript**" to the jury was **false** and **misleading**.

8) As a result of Mr. Majchrzak's **subornation** of John Kemp's testimony on **redirect** and in his **closing argument**, Mr. Majchrzak was able to **paint** me as the **gunman** and a **dangerous** criminal in the **minds** of the jury.

9) Consequently, **my defense** that I had **no intent** to **participate** in a robbery that I did **not know** would happen and was not the **gunman** was **prejudiced**.

10) In addition, Mr. Majchrzak **failed** to **correct** John Kemp when he denied during cross-examination what he previously told Justice Fisher.

11) Mr. Majchrzak also **failed** to **correct** John Kemp when he **denied** his **signed** police report on the positive **identification** of Jose Arroyo as the **gunman**.

12) Despite John Kemp's complete change of testimony from his previous court proceeding before Justice Fisher and the fact that Mr. Majchrzak was **present** and **heard** his testimony, he strongly **defended** John Kemp's conflicting **testimony** by false and misleading **statements of facts** to the **court and jury**.

13) I respectfully contend that Mr. Majchrzak's **reckless** disregard for the **truth** in **supporting** John Kemp's **perjured** and inconsistent **testimony** at my trial when he knew or should have known **otherwise, engaged** in a **malicious prosecution** that dealt a **fatal** blow to any chance I had in **receiving** a **fair trial** and **due process of law**.

### X. Point Four John Kemp's Criminal Records

The following information shows the **extensive** criminal history of John Kemp:

1) Shortly after my trial and conviction, another **inmate** at the Monroe County jail told me that Mr. Kemp was a child molester and he had served time with him at Attica.

2) I relayed this information to Mr. Rolfe who is the grandfather of my daughter and also an interested party to my case.

3) Mr. and Mrs. Rolfe then checked the Internet and discovered John Kemp's **inmate** record and notified Mr. Bertram of this information.

4) Later after my sentence Mr. Rolfe requested an electronic search of John Kemp's records from the city and county records department.

5) The clerk completed the search and handed Mr. Rolfe a manila package of John Kemp's records.

24

6) After Mr. Rolfe left the building, he noticed that the package had some weight to it. Curious Mr. Rolfe along with his wife sat down on a bench in the Civic Center Plaza and started **reading** John Kemp's **criminal** records.

7) Mr. and Mrs. Rolfe were absolutely **shocked** to learn that John Kemp sexually molested a three-year-old female child, sodomized and sexually molested a 14-year-old female and that his own sister charged him with attempted incest and stated in her report that her brother raped her five years before.

8) In yet another report, John Kemp's invalid mother had him arrested after he threatened to burn down her house after she locked him out because she couldn't stand his violent and disruptive behavior.

9) In addition to the above, Mr. Kemp was also charged with assaulting a young teenage boy with a pipe and sending him to the hospital, breaking down the door on another person's property and violating a restraining order from his ex girlfriend who also stated in her police report that John has been arrested 141 times and should be in a hospital instead of jail.

10) Finally the last record showed that John Kemp went crazy and threw garbage cans at and damaged a police vehicle when they were called to assist in the repossession of Kemp's rented stereo system.

11) For his last crime, John Kemp was **arrested**, **prosecuted** and **convicted** by the Rochester Police Department, the Monroe County District Attorney's Office and the Rochester/Monroe County Court system in **1999,** the year **before** my trial for criminal mischief.

12) As Mr. and Mrs. Rolfe read the reports, a records clerk came up to them in the plaza and asked for the records that contained the sexual details back.

13) Mr. Rolfe not wanting to see her get into trouble with her boss gave permission for her to take out the records with the sexual details.

14) ADA Majchrzak who knew or should have known of John Kemp's criminal past **denied** that he had any **imputed** knowledge of such information.

15) Later the New York State Appellate Court and the Federal Western District Court of New York **did not** believe ADA Majchrzak and **charged** him with a **Brady** Violation.

### XI. Point Five ADA Majchrzak's Participation and Involvement

The following **information** and **Exhibits** further **supports** my contention in **Section IX Point three (ADA Majchrzak's Malicious Prosecution)** and **shows** ADA Majchrzak's participation and involvement:

1) Shortly after the robbery incident on Dewey Ave on Feb 29, 2000, **ADA Majchrzak** was **assigned** as the **chief prosecutor** to the **case**.

2) The first suspect that Mr. Majchrzak **investigated** was named Jose Arroyo who was **identified** as the **gunman** by **Terrance Mclaurin** the store clerk in a **police line up**.

3) Upon information and belief my source being a **police report (Exhibit 2)** dated April 15, 2001 that **reported** ADA Majchrzak and Public Defender Mary Davison along with her investigative aide **attended** the Jose Arroyo **lineup** at police headquarters.

4) This police report **confirms** that ADA Majchrzak was **actively** involved in the **police investigation** of the **robbery incident** on Dewey Avenue.

5) In fact, Mr. Majchrzak was **actively** involved in both **prosecutions** that **spanned** more than a **year** and **concluded** with my sentence on **April 28, 2001**.

6) Around September or October 2000, Mr. Arroyo and I were **released** after **Justice Fisher** found John Kemp **not** credible.

7) However, Mr. Majcrzak **did not** drop his **prosecution** of me and after several hearings I was scheduled for **trial** on January 9, 2001.

8) Before the jury was called, I was **offered** a **plea deal** from Judge Geraci. The deal was for **2 to 3 years** and **reduction** of the felony offense. Judge Geraci also said that if I **refuse** the deal I would be facing **25 years** if I were **convicted**.

9) I decided to **decline** the deal and **go** to trial since I was **not** the gunman and had **no intent** to participate in a robbery that I **did not** know would **happen**.

10) In spite of the **warning signs** that ADA Majchrzak had **severe credibility** problems with his witnesses (i.e. Justice Fisher Decision on John Kemp and the Sarah Bower material witness charge), my case proceeded to trial with his key

eyewitness being a discredited brain damaged convicted child molester who changed his story on who was the **gunman**.

11) In addition, I respectfully contend that ADA Majchrzak knew or should have known that he also had a serious **credibility** problem with his **second** witness Sarah Bower when he had her **arrested** on a material witness charge and **forced** her to give **testimony** at my trial **about** car stereo equipment that **was not** reported stolen and who also tried to **steal** my stereo equipment in her **police report** that she **made** to Investigator Cotsworth.

12) Mr. Majchrzak then **denied** he knew anything **about** the criminal records of John Kemp even though he had extensive contact with John Kemp, other prosecutors and his police team.

13) This police team included Investigators **Murphy, Mace** and **Cotsworth** who all **testified** at my trial.

14) In addition to Mr. Majchrzak's police team, there was **many other** supporting Rochester Police Department **personnel** and **employees** of the Monroe County District Attorney's Office **involved** in my case.

15) I respectfully contend that considering Mr. Majchrzak long involvement in both cases and his **frequent** contact with **police** personnel, it would seem inexplicable that **nobody** in the **Monroe County District Attorney's Office** or the **Rochester Police Department knew** the extensive criminal and violent history of John Kemp nor **would tell** Mr. Majchrzak **about** it.

16) However this is exactly what **happened** in my case.

17) I had to find out **myself** about **John Kemp's criminal history** from another **inmate** among hundreds that were incarcerated in the Monroe County jail.

18) **Brady** material that this inmate **knew** and that **ADA Majchrzak** and the **Rochester Police Department** both **claimed** to have **no knowledge of**.

19) I respectfully contend that **ADA Majchrzak** and the **Rochester Police Department** knew or should have known of John Kemp's extensive **criminal history** because he was **well known** to the Monroe County District Attorney's Office who **prosecuted** him for all his **offenses**, the Rochester Police Department

27

who **investigated** and **arrested him** numerous **times**, the Public Defender's Office who **defended** him and the Monroe County and the Rochester City Courts who both **tried** and **sentenced** him.

20) Despite these overwhelming sources of imputed knowledge, Mr. Majchrzak **steadfastly** maintained that he did **not** know that **John Kemp** had a **criminal record**. Also Mr. Majchrzak's police team were **never** questioned or challenged by the courts as to why the Rochester Police Department **never** **disclosed** John Kemp's criminal records to my **defense**.

21) Furthermore, ADA Majchrzak proudly stated to Judge Geraci in my 330 hearing that **he (Majchrzak) didn't make it a practice to check on his witnesses' criminal history**.

22) I respectfully contend that Mr. Majchrzak's above statement clearly shows **negligence** for his **Brady obligations** as mandated by the Supreme Court and **negligence** to his ethical **duties** as a **prosecutor**.

23) In addition, Public Defender Mary Davison **specifically** asked Mr. Majchrzak for **all** pending criminal actions and criminal records of his **witnesses**. Ms. Davison's request was made **many** months before my trial in ADA Majchrzak's **prosecution** of Jose Arroyo.

24) I also contend that it would seem almost inexplicable that Mr. Majchrzak wouldn't be curious to see if his witnesses **had** a criminal record or pending criminal action since he **readily** had **computer** access to **anyone's** criminal records at his office and it might be **brought up** at trial.

25) In fact, **Terrance Mclaurin** the store clerk who identified Mr. Arroyo in the lineup as the gunman had two felony **convictions** for offenses that involved **drugs and alcohol**.

26) Mr. McLaurin's **criminal records** were also **never** disclosed to me and I respectfully contend that Mr. Majchrzak failure to also turn over Mr. McLaurin's convictions to my **defense** resulted in a **third Brady violation**.

27) In addition, I respectfully contend that another **Brady** violation also occurred when DA Investigator Casper Caceci was assigned to track down the **whereabouts** of Mr. McLaurin.

28

28) I respectfully contend that Investigator Caceci acted in the role of a **police** investigator in his investigative **duties** with the District Attorney's Office and knew or should have known of the **criminal records** of **John Kemp** and **Mr. McLaurin** that were in his **possession** and **control**.

29) I respectfully contend that Investigator Caceci should have honored his ethical and legal obligations under Brady to **disclose** this information to Mr. Majchrzak and my **defense**.

30) Investigator Casper Caceci involvement in my case is **documented** in his investigative report that Wendy Ezell, Mr. McLaurin's sister in law said that Terrance (McLaurin) sold a fish bowl without her permission, handed her his store keys back and took off to California and then would be painting houses in the Bahamas.

31) With Mr. Mclaurin **unavailable**, Mr. Majchrzak then relied on John Kemp as his **key** eyewitness despite being previously **discredited** by Justice Fisher.

32) On January 9, 2001 the day of my trial, Mr. Majchrzak told Judge Geraci he intended to use John Kemp as his **key** eyewitness and let him **change** his story.

33) During the pretrial conference, Judge Geraci **questioned** Mr. Majchrzak about **John Kemp** and the **Justice Fisher's ruling**.

34) Mr. Majchrzak answered **that he had no problem using John Kemp as his star witness or any problem with John Kemp changing his story**.

35) My case then proceeded to trial where I found out that I was now being prosecuted as the **gunman**.

36) My defense lawyer was also completely **befuddled** by this change of events because he had **prepared** his case that I was **not** the gunman.

37) Mr. Bertram protested to Judge Geraci **"This is my whole case, we are not the gunman"**.

38) Despite the **protest** from my defense, Judge Geraci allowed John Kemp to testify that I **was now** the gunman.

39) During his cross-examination, Mr. Bertram severely **impeached** John Kemp on his **previous testimony** before **Justice Fisher**, his **police reports** and his in court **identification** of Mr. Arroyo being the gunman.

40) On the stand, John Kemp **denied** everything in his police reports and testimony before Justice Fisher. He **blamed** Justice Fisher and the police for his **prior testimony** and said that the police **falsified** his records.

41) I respectfully contend that Mr. Majchrzak having seen and heard the testimony of John Kemp knew or should have known that Kemp's testimony was **false** and then **failed** to **correct** him.

42) In fact Mr. Majchrzak even **admitted** to my above contention in paragraph 41 in his statement to Judge Geraci that John Kemp was **impeached** about as much **as anyone** can be **impeached**.

43) Despite seeing that his star eyewitness was **not** telling the truth and in order to **save** his case, Mr. Majchrzak with reckless disregard for the real truth **engaged** in a **malicious prosecution** and strongly **supported** John Kemp's perjured testimony in his **redirect** that it was **Justice Fisher** and the **police's fault**.

44) Mr. Majchrzak further **expanded** the prejudicial damage by **vouching** for John Kemp's **credibility** in his **closing** argument and stated to the jury that John Kemp was **credible**, that John Kemp was **speaking** the **truth** when he knew or should have **known** otherwise.

45) In spite of John Kemp's trial testimony fiasco, Mr. Majchrzak **continued** his malicious prosecution when he called Sarah Bower to the stand to testify about an **alleged** statement that she said that I made to her, **"Where did you think I got this s--- from?"**

46) I respectfully contend that Sarah Bower's malicious **introduction** to my trial **introduced** more **perjury** when she **unjustly** accused me of **stealing** stereo equipment that was **owned** by Mr. Rolfe and me.

47) Furthermore Mr. Majchrzak knew or should have known that I had given **permission** to the police to search my car when I was arrested and no stolen items **were found** or introduced at my trial as **physical evidence**.

48) The second prong of Mr. Majchrzak's malicious prosecution involved my police statement that contained no smoking gun.

30

49) Mr. Majchrzak stated to Judge Geraci just before my trial, as you know Judge, Valentin's police report **basically** said that he was the **unwitting dupe** of this other guy, and his **intent** was innocent.

50) In my Habeas Corpus Grant, Magistrate Judge Victor Bianchini wrote "the prosecutor's case was more akin to a **house of cards than a foundationally sound structure.**" (Page 38) Habeas Corpus Decision and Order January 10, 2011.

51) I respectfully contend that ADA Majchrzak maliciously built this **house of cards** with a **reckless** disregard for the **truth**.

52) Mr. Majchrzak built his prosecution on multiple Brady **violations** by withholding everything favorable to my defense that was material to the outcome of my trial.

53) In addition, Mr. Majchrzak used perjured witnesses' testimony that he knew or should have known was **false** and did not **matched** the police reports and trial **testimony** of John Kemp in the Justice Fisher hearing or **matched** the information he gathered from his role he assumed as a **police investigator** in his **investigations** of both the Arroyo and Valentin cases' to **build** his prosecutions.

54) When Mr. Majchrzak was confronted at pretrial that something might be **wrong** with the **proof** of his case, Mr. Majchrzak proudly **told** Judge Geraci **that he had no problem** with his case **proceeding** to trial.

55) In fact, Mr. Majchrzak had **no problem** with my case **after** my trial, **conviction** and **appeal** and **never** disclosed any **Brady** material to my **defense**.

56) In addition, Judge Geraci was also very **critical** of Mr. Majchrzak unethical **tactics** used in the prosecution of my case.

57) Judge Geraci's **comments** as to the **fairness** of my **trial** and Mr. Majchrzak's **unethical** trial tactics in his use of John Kemp as a credible witness are **expanded** on in the next section of this Complaint in **Section XII. Point Six** and in **Section XIII. Point Seven March 27, 2001 330 Motion Decision and Order**.

## XII. Point Six Judge Geraci's Trial Critique of ADA Majchrzak at 330 Motion Hearing March 7, 2001

After John Kemp's criminal records were **discovered**, Mr. Bertram filed a 330 Motion with Judge Geraci to **vacate** my conviction on the grounds of a **Rosario/Brady** violation.

1) Upon information and belief my source being a transcript **(Exhibit 3)** dated on March 7, 2001 recording my **330 Motion hearing**.

2) In this hearing, Judge Geraci heard **arguments** from Mr. Bertram against Mr. Majchrzak's suppression of John Kemp's criminal records.

3) During this hearing, Judge Geraci and Mr. Bertram raised **serious ethical and legal questions** on Mr. Kemp's **credibility**, Mr. Majchrzak's **conduct** and the **fairness** of my trial in the following transcribed statements:

4) Mr. Bertram protesting to Judge Geraci said: "It was clear that the case was fraught with **duplicity and deceit** from the very beginning. The district attorney knew, and I think this is undisputed, that Mr. Kemp (phonetic) was going to **testified** in a matter **contrary** to the way he **testified** in the **trial** of Ayroyo (phonetic), Mr. Valentin's co-defendant, as well as **contrary** to statements he had given to the **police**. Not only that, but **contrary** to the testimony given by the victim, Mr. McClarin (phonetic) at a **preliminary hearing** heard against Mr. Valentin." (Page 2 and 3, March 7, 2001 Sentence Transcript)

5) Judge Geraci told Mr. Majchrzak **"and you don't want to know whether or not he (Kemp) has a criminal history in preparation for your case?"**

6) Mr. Majchrzak responded back **"Judge, I don't make it a practice to find the information"**. (Page 5, March 7, 2001 Sentence Transcript)

7) Mr. Majchrzak responded to Judge Geraci's criticism **"Your asking what my trial preparation strategy is"**.

8) Judge Geraci: "**Fairness**. **Let's talk about fairness**. There has to be some **question** in your mind regarding that testimony in the Grand Jury from the other eyewitness that the other person **possessed the gun**. Now your witness says this defendant **possessed** the gun and **you don't want** to **inquire** into that witness

regarding his **background** and regarding his **veracity**. Isn't that your **obligation as a prosecutor?**" (Page 6, March 7, 2001 Sentence Transcript)

9) Judge Geraci: "Don't you have to test the **veracity** of the **statement** made to **you** (Majchrzak) when you have direct **contrary** information from the other eyewitness. **Don't you think you would have an obligation to do that?**" (Page 6, March 7, 2001 Sentence Transcript)

10) Judge Geraci to Mr. Majchrzak: "This is not a **minor** disagreement. **This goes to the very heart of the case**. This is the significant **factor** regarding who walked in that store and **who possessed the gun**, isn't that a **significant difference** between what you had presented to a **grand jury**, and what you had a **trial jury here in this courtroom?**" (Page 7, March 7, 2001 Sentence Transcript)

11) Judge Geraci: "And there was a standard response on the **Brady**." "Um, I'm going to reserve decision. This **case** is obviously **very disconcerting** the way the whole thing has been handled with the co-defendant, Mr. Arroyo's charge being discharged with the eyewitness (McLaurin) fleeing to Florida, apparently being uncooperative, testifying Mr. Arroyo was the gunman, with the witness (Kemp) **coming** in to trial here indicating Mr. Valentin was the **gunman**."

"With the facts turning out subsequent to the trial that the primary witness (Kemp) against Mr. Valentin is a double predicate **felon** and has three misdemeanor **convictions** that **the jury** never heard."

   **"It's all very, very disconcerting."**

"This **whole process**, this whole courtroom seeks to seek **truth** as best as we can, and in this case it appears, um**, that wasn't done**."

"There was not a **truth-seeking mission**. We need to **address** that. So I'll reserve decision. I'll write a decision on this case." (Page 16 and 17, March 7, 2001 Sentence Transcript)

12) The statements made and **recorded** by Judge Geraci and Mr. Bertram in the **March 7, 2001** Sentence Transcript supports **Section VII. Point One** (John Kemp's Perjury), **Section VIII. Point Two** (ADA Majchrzak's Subornation of Mr. Kemp's Perjury), **Section IX. Point Three** (ADA Majchrzak's Malicious Prosecution), **Section X. Point Four** (John Kemp's Criminal Record) and **Section**

**XI. Point Five** (ADA Majchrzak's Participation and Involvement) **above** in this Pro Se Complaint.

13) As a result, I respectfully contend that Mr. Mazchrzak knew or should have known of the real **facts and proof of my case**. I also contend that ADA Majchrzak acted with reckless disregard and **engaged** in a malicious prosecution against me using **perjured testimony**, making **false and misleading statements** to the **court and jury**, committed **multiple Brady violations** and **suppressed** everything **favorable** to my defense that was **material** to the outcome of my trial and then **admitted to Judge Geraci** that **he had no problem** with my case **proceeding to trial**.

14) I respectfully contend that the **cumulative** effect of Mr. Majchrzak's **illegal actions** to **allow** and then **suborn** the perjury of John Kemp dealt a **fatal** blow to **any chance** I had in receiving a **fair trial** and **due process of law** and **violated** my **Constitutional** due process **civil rights** under the **Fifth** and **Fourteenth** Amendments.

## XIII. Point 7 March 27th, 2001 330 Motion Decision and Order on ADA Majchrzak's Trial Tactics

Upon information and belief my source being Judge Geraci's Decision and Order (**Exhibit 4**) dated March 27, 2001 on my 330 Motion.

The following transcribed **statements** made by Judge Geraci about **what happened** in my case are as follows:

1) "On January 9, 2001, jury selection was scheduled to commence. At a **pre-trial** conference the court **questioned** the People's **ability** to proceed based on the **failure** of the People to **produce** the complaining witness, Terrance McLaurin, coupled with the **questionable** credibility of the **second** witness, John Kemp, based upon the **prior ruling** of Justice Fisher. Further **complicating** the situation, the People **now** proffered that the witness, **John Kemp**, would **testify** that the defendant, **Hector Valentin**, was the **individual** who entered the store with the **gun**".

"This representation was made in light of the People's knowledge that the witness, Terrance McLaurin, had testified at the **preliminary hearing** and in the **Grand Jury** that the defendant Jose Arroyo was the **individual** with the **gun** and was **adamant** that the **second** individual, Hector Valentin, **did not have the gun**" (see Grand Jury testimony of Terrance McLaurin, pages 13 and 14).

"Additionally, the People, in their responding **papers** to defendant's omnibus motion **indicated** that their **theory** was that the defendant, **Hector Valentin**, was merely an **accomplice** and **did not** possess the **handgun** utilized in the robbery".

"When the **court** pointed out these **concerns** to the prosecutor just prior to jury selection, **his (Majchrzak) response was simply that he felt the People had no problem with their proof or proceeding on the case.**" (Page 4 and 5, March 27, 2001 Decision and Order)".

**"Undeterred, the People plowed full steam ahead in the prosecution of Hector Valentin"**.

"Even in the light of the **Justice Fisher's ruling** regarding the **reliability** of Mr. Kemp and the People's **knowledge** that Mr. Kemp intended to testify **contrary** to the other **eyewitness** to the robbery, specifically regarding the possession of the weapon during the robbery, the prosecutor **announced** that **he did nothing to attempt to test his witness' credibility**." (Page 7, March 27, 2001 Decision and Order)

2) Judge Geraci's comments that Mr. Majchrzak **had no problem** with his **proof or proceeding** on the case and that he **did nothing** to attempt to **test** his witness (Kemp) credibility **raises** serious **ethical** and **legal** questions.

3) The Lawyer's Code of Professional Responsibility states that a lawyer has a **legal** as well as an **ethical** responsibility to **correct testimony** that he **knows to be false.**

4) I respectfully contend that there is clear and convincing evidence that Mr. Majchrzak **failed** to either **test or correct** Mr. Kemp's **testimony** before my trial or at my trial.

5) I respectfully contend that Mr. Majchrzak's **failure** to honor his **legal and ethical** obligations as a prosecutor **perpetrated** a **fraud** on the **court** and **jury** by

**allowing** Mr. Kemp to **perjure** himself at my trial and **violate** my Constitutional due process rights to a fair trial and due process of law.

6) Despite the **serious ethical** and **legal issues** and the **fairness** of my trial that were **raised** during my 330 motion hearing, Judge Geraci **denied** my request for a **new trial** and ruled that **no** Brady/Rosario violation **occurred** because the prosecutor was **unaware** of the **criminal** history of John Kemp.

7) I was then sentenced to six years in State prison with five years probation.

## XIV. Howard Relin-Attorney Grievance Committee-NYS Attorney's General Office and the Request for Investigation

1) Upon information and belief my source being a letter **(Exhibit 5)** dated February 11, 2001 that Mr. Rolfe wrote to Howard Relin to bring to his **attention** the **issues** that were **raised** about the **fairness** of my trial and a **request** for his office to look into this matter.

2) Upon information and belief, my source being a letter **(Exhibit 6)** dated December 8, 2001 that Mr. Rolfe also wrote to Howard Relin and **enclosed** a copy of the **grievance** letter **(Exhibit 7)** dated November 29, 2001 that he **sent** to Mr. Drake at the Attorney Grievance Committee.

Mr. Rolfe in his letter to Howard Relin also **requested** that his office **conduct** an internal **investigation** into this matter based on the attached **letter**.

3) Upon information and belief, my source being a letter **(Exhibit 8)** dated December 11, 2001 that Mr. Relin wrote back to Mr. Rolfe that **basically** said that John Kemp's **participation** in my trial **was not important** and he found **no** misconduct **committed** by his former employee Mr. Majchrzak.

Mr. Relin also said it was the **testimony** from **Sarah Bower** and my **police statement** that convicted me.

4) I respectfully contend **if** Mr. Relin had conducted an investigation into Mr. Majchrzak conduct, he would have **discovered the Sarah Bower theft information in his files** and **not** have used her as a **credible witness** to Mr. Rolfe in his letter.

5) I also respectfully contend that Mr. Relin acted with reckless disregard when he knew or should have known of Sarah Bower's **records** and **committed** additional professional **negligence** with his **failure** to **conduct** an official **investigation** into Mr. Rolfe's perjury **complaint** that was **supported** by my trial transcripts, transcripts from the Justice Fisher's hearing and John Kemp's official police reports.

6) In addition, I contend that Mr. Relin's lack of action, **conflict of interest** and **failure** to **correct** the **misconduct** of his employees **violated** my Constitutional due process rights to a fair trial and due process of law.

7) Mr. Relin also mentioned to Mr. Rolfe in his letter that Mr. Majchrzak was a former employee.

8) It is unclear if Judge Geraci and Howard Relin took any **disciplinary** action regarding this matter **against** Mr. Majchrzak since Judge Geraci was very upset with Marjchrzak's trial **tactics** and the use of John Kemp as a **credible** witness.

9) A discovery **request** for any information on the above **matter** including Mr. Majchrzak's **personnel records** will be **requested** in the **discovery** litigation of this Complaint.

### A. Howard Relin's Letter-Kemp's Testimony Was Not Important!

Upon information and belief my source being a letter **(Exhibit 9)** dated January 15, 2002 that Mr. Rolfe wrote to Mr. Muldoon about the response he received from Howard Relin on his December 11, 2001 letter where Mr. Relin **basically** said that the **testimony** of John Kemp was **not important** in the **outcome** of my **trial**.

Mr. Rolfe wrote to Mr. Muldoon:

Mr. Relin said in his letter that the testimony of John Kemp was **not important**. I completely disagree with his statement. Kemp's testimony was critical to letting Mr.Valentin's case go to trial and having him taken back into custody after his Huntley hearing. It was important in supporting Mr. Majchrzak's opening statement to the jury that Mr. Valentin was the **prime suspect** and co supporting Ms. Bower's testimony and it was important to Mr. Majchrzak's case

of putting an eyewitness in front of the jury. To now say that this witness was **not important** completely ignores the facts of Mr. Valentin's case.

The second enclosed letter **(Exhibit 10)** dated December 21, 2001 from Mr. Drake is also contradictory. He said my most recent correspondence **does set** forth any new facts that would warrant a reconsideration of our prior decision. I believe he meant does not. However, all my points that asserted Mr. Majchrzak engaged in misconduct were supported by documentation and none of these points were answered.

## B. Transcripts Excerpts Supporting Kemp's Perjury and Request for Official Investigation!

Upon information and belief, my source being a letter **(Exhibit 11)** dated August 16, 2002 that Mr. Rolfe wrote to Howard Relin in response to his letter dated December 11, 2001.

In this letter, Mr. Rolfe stated he has been quiet on this matter because he wanted to read my trial transcripts.

From those transcripts Mr. Rolfe documented the **perjury** of John Kemp and the **subornation** of that perjury by Mr. Majchrzak from their recorded testimony from the Justice Fisher's suppression hearing, the police reports and my trial transcripts.

Mr. Rolfe's letters regarding his request for an investigation into John Kemp's perjury are as follows:

1) Mr. Rolfe wrote in this letter the following:

The purpose of this letter is to report to your Office, that a **serious crime** was committed at the trial of Mr. Hector Valentin and request an **official** and **impartial** investigation by your Office to look into this matter. I am referring to the serious crime of **perjury**, a class D felony, which I strongly believed was committed by the key eyewitness, John Kemp, whose testimony was crucial in Mr. Valentin's case proceeding to trial. I am also making the following claim that ADA Daniel Majchrzak **suborned** Kemp's perjury by failing to **correct it**. I strongly believe that the following information contained in this letter shows clearly that Mr. Kemp testified under oath with the deliberate intention to deceive on material facts that directly affected the outcome of Mr. Valentin's case.

2) Upon information and belief my source being a follow up letter **(Exhibit 12)** dated September 10, 2002 that Mr. Rolfe wrote to Mr. Relin.

This letter included additional information from the transcripts supporting the perjury of John Kemp and the subornation of perjury by Mr. Majchrzak.

Based on this new information, Mr. Rolfe again requested an investigation into the perjury complaint:

In conclusion, the information in the transcripts proves without any doubt that John Kemp perjured himself and Mr. Majchrzak suborned it. Mr. Majchrzak knew or should have known that John Kemp's testimony was false. Mr. Majchrzak was present at Kemp's suppression hearing and heard what Mr. Kemp said. In addition, Mr. Majchrzak also knew that the other eyewitness (Terrance McLaurin) version was in direct contradiction with Mr. Kemp's version. Mr. Majchrzak failed not only to correct Mr. Kemp's false testimony but deliberately engaged in misconduct by making misleading statements to the Jury in support of it. As a result, a serious miscarriage of Justice occurred in Mr. Valentin's case.

I have also previously written to Justice Fisher as well as to other interested parties including the Democrat and Chronicle. I am bringing this matter to your attention because I strongly believe that the serious crime of perjury should be addressed on the front end by your Office instead of on the back end by the Appellate Court. At this point, I am waiting for a response as to what action your Office intends to take on this matter.

3) Upon information and belief, my source being a letter **(Exhibit 13)** dated October 7, 2002 that Mr. Rolfe wrote to then New York State Attorney General Eliot Spitzer filing a **conflict of interest** complaint against Mr. Relin and to request an official **investigation** by his office into this matter.

The following letter summarizes Mr. Rolfe experience with Howard Relin and his reckless disregard for my Constitutional due process civil right to a fair trial and due process of law when he ignored Mr. Rolfe's perjury complaint and **committed** a Brady violation when he did not turn over the pending criminal charge information on Sarah Bower to my defense.

Mr. Rolfe out of frustration with the run around he received from Mr. Relin and Mr. Drake on the **request** for a **perjury investigation** wrote to Mr. Spitzer in his letter:

Dear Mr. Spitzer,

I am writing to file a **conflict of interest** complaint against Monroe County District Attorney, Howard Relin, and to request an official investigation by your office into the following matter.

On August 16th and September 10th, 2002, I wrote two letters **(Exhibits 11 and 12)** (copies enclosed) to Mr. Relin and reported to his office that the serious crime of perjury was committed by their key eyewitness, John Kemp, and suborned by his Assistant District Attorney Mr. Daniel Majchrzak at the trial of

39

Mr. Hector Valentin. I specifically requested an official investigation of these charges by a special prosecutor and documented these claims from the police reports and trial transcripts.

After repeated telephone calls to Mr. Relin requesting a status on my request, Mr. Relin finally returned my call. In the following conversation, Mr. Relin talked about the other aspects of Mr. Valentin's case, which were not relevant to what I had originally requested. When I asked him specifically about the perjury charge, he replied that he didn't believe that any were committed and stated that he would take no action. A copy of my letter sent to Mr. Relin confirming this conversation is also enclosed.

I felt that Mr. Relin's response on this matter severely undermines the public trust. When a layman writes to report a serious crime and backs their claim with compelling evidence, I strongly believe that they are entitled to have it examined by an **impartial investigation** to determine the facts for merit. To have Mr. Relin say that they don't believe that any crime was committed without offering any reasons to back their statement, I find is not only unacceptable but is prejudicial and irresponsible as well.

Second, I strongly believe that Mr. Relin has a **conflict of interest** because this matter involved his office and a serious misconduct charge against one of his former prosecutors. Therefore, I cannot see how Mr. Relin can be **fair or impartial** investigating his own office. I strongly believe he should recuse himself from this matter and turn it over to your office for an impartial investigation by a special prosecutor.

Since Mr. Relin has failed to do this, I am requesting that your office assign a special prosecutor to investigate my perjury and subornation of perjury charges and the false accusations made by Mr. Kemp against the police and Justice Fisher.

4) Upon information and belief, my source being a letter **(Exhibit 14)** dated on October 22, 2002 that Mr. Rolfe received from Mr. Drago at the NYS Attorney's Office.

Mr. Drago wrote that Mr. Spitzer asked him to respond back to Mr. Rolfe and thank him for making him aware of my concerns regarding the Monroe County District Attorney's Office.

However Mr. Drago informed Mr. Rolfe that the authority to regulate all lawyers is placed by law with the Appellate Division of the Supreme Court and told him to file his complaint with the Attorney Grievance Committee.

5) Mr. Rolfe again wrote one last time to the Attorney Grievance Committee requesting a reconsideration of the perjury matter. Mr. Drake wrote back to him on January 2, 2003 and told him that the matter will remain closed and they will respond to no more requests from him.

6) Upon information and belief, my source being a letter **(Exhibit 15)** dated on April 29, 2001 that shows the above actions and letters taken by Mr. Rolfe were done with my permission.

7) Mr. Rolfe as previously mentioned in this Complaint is the grandfather of my daughter and an interested party in this matter who supports my contentions that my Constitutional due process civil rights were violated and that I did not receive a fair trial and due process of law.

8) Mr. Rolfe is also willing to testify that the information submitted by him is a **true** and **accurate statement** of the **facts known to him** and were included by me in this Complaint to support my claim that my Constitutional due process civil rights to a fair trial and due process of law were violated by Mr. Relin when he failed to honor his ethical and legal duties and turn over Sarah Bower pending criminal charge information to my defense when he was the District Attorney.

9) In addition, I respectfully contend that Mr. Relin **failed** to train his employees on their **ethical** and **legal** obligations under **Brady** or the **Lawyer's Code of Professional Responsibly** because **no** employee under his direct supervision ever turned over any favorable information on John Kemp and Sarah Bower to my defense **before**, **during** and **after** my trial and appeal when this **Brady** information was clearly in their **possession and control**.

### XV. May 2003 New York State Appellate Appeal

In May 2003, Mr. Muldoon filed a Notice of Appeal **(People v Valentin)** with the New York Supreme Court, Appellate Division, Fourth Department. I also filed a Supplemental Pro Se Appeal.

On November 23, 2003, the Appellate Court **ruled** that there was a **Brady violation (People v Valentin)** by the trial prosecutor **suppressing** the criminal records of his key eyewitness John Kemp.

This **decision** is now one of the **leading** Brady violation cases referred to by New York defense lawyers regarding the **ethical and legal obligations** of

**prosecutors** to turn over any information **favorable** to the defense and **material** to the outcome of the trial. The decision states:

Upon information and belief, my source being the **(People v Valentin)** decision **(Exhibit 16)** dated on November 21, 2003.

In brief, the Supreme Court of the State of New York, Appellate Division, Fourth Judicial Department in **(People v Valentin) ruled** that there was a **Brady violation** on the **withholding** of the criminal records of the key eyewitness John Kemp by the trial prosecutor (ADA Majchrzak).

The Appellate Division, Fourth Judicial Department further **ruled** that "The **requirement** that the **Brady** material be in the People's **possession or control** *** has not been interpreted narrowly". (People v. Santorelli, 95 NY2d 412, 421; People v Bryce, 88 NY2d 124, 128; People v Vilardi, 76 NY2d 67, 73). "A prosecutor **must learn** of any **favorable** evidence known to others acting in the **government's behalf** and promptly **disclose** any such **material** evidence to the defendant" citing (Santorelli, 95 NY2d at 421; People v Wright, 86 NY2d 591, 598 and the People v Novoa, 70 NY2d 490, 498.

This decision based on the **Brady** rule **confirmed** that the trial prosecutor **violated** my Constitutional due process **civil rights** to a fair trial by the **withholding** of the criminal records of John Kemp.

However, the New York Appellate Court also **ruled** that if the **criminal records** of John Kemp were **revealed** to the jury, it was **harmless error** and it **would not** have affected the **outcome** of my **trial**.

In my Habeas Corpus grant, Federal Magistrate Judge Bianchini **ruled** that the New York State Appellate Court made an **incorrect Brady rule analysis** regarding **materially** which would have **affected** the **outcome** of trial, **granted** me Habeas Corpus relief and **expunged** my convictions.

Note-At the time of my **appeal** in 2003, I did **not** know that the **second witness** Sarah Bower had **a pending criminal action** against her **before** my trial and the additional suppression of this Brady material by ADA Majchrzak, the

Monroe County District Attorney's Office and the Rochester Police Department
**denied** me the **opportunity** to file a **second Brady** violation **against** her in my
New York State Appellate Court appeal.

## XVI. New York State Court of Appeals

The New York State Court of Appeals declined to review **People v Valentin** and
effectively ended my appeal with the New York State Court system.

## XVII. Sarah Bower's Trial Testimony

Sarah Bower was a material witness who was **arrested** because she was
**unresponsive** to service. After her arrest she agreed to testify about a hearsay
statement **"Where do you think I got this s--- from"?**  that she alleged I made to
her on the stolen property.

The following is Sarah Bower's trial transcript testimony that Mr. Majchrzak
wanted to admit into the court proceeding to place me in possession of stolen
property:

1) Pre trial testimony discussion between Mr. Majchrzak and Judge Geraci:

Mr. Majchrzak:   His (Valentin) admission to her makes no sense; he says where
                 you think I got these. It doesn't make any sense to let her
                 testify to that admission which is clearly admissible and then
                 not get in that part about the **speakers**. (Page 330, Trial
                 Transcript)

The Court:       Is she – are these **speakers** visible to her?

Mr. Majchrzak:   I believe they are, Judge.

The Court:       Could she describe those?

43

Mr. Majchrzak:     She can describe them.

The Court:         Well, **that's an issue, too**. If she can, then I allow it in. (Page 330, Trial Transcript)

The following is transcribed excerpts of Sarah Bower's trial statements on her speaker testimony:

Mr. Majchrzak Q: And the speakers in the **back**, you said – okay. Could you describe where, exactly, they were and what, exactly, those speakers looked like to you?

Sarah Bower A:    Um, dark colored, and they were in each corner of the windows in the back.

Mr: Majchrzak Q:     Okay. Sitting on top of the –

Sarah Bower A:       On top of the –

Mr. Majchrzak Q:     **Behind the seat**?

Sarah Bower A:       Yes, sir.

Mr. Majchrzak Q: And if you had to compare them size-wise and shape wise, what would you compare them to?

Sarah Bower A:    I don't know, they're, say – I don't know, **six by nine**, I'm not sure. I don't know.

Mr. Majchrzak Q: What was the physical shape of them: round, oval?

Sarah Bower A:     I'm sorry, **rectangular**.

(Page 342 and Page 343 Trial Transcripts, Sarah Bower-DX-Mr. Majchrzak)

2) When Mr. Bertram cross-examined Sarah Bower and asked her to explain my alleged statement **"Where do you think I got this s--- from?"** and **"What was the equipment?".** Sarah Bower replied **and expanded the s--- to include "The tape face player, the speakers that were in the back. There was a speaker box (boom box) in the back seat, in the trunk. The whole system in— it's in general."**(Page 358, trial transcripts).

The following points contradict Sarah Bower's trial testimony and police reports:

1) The **speakers** and the other items she described **were never** reported stolen and her testimony was also **contradicted** by Mr. Rolfe's in his Affidavit. **(Exhibit 17)**

In fact theses items described in Sarah Bower trial testimony as stolen were also car stereo components that she **claimed** ownership of in her police report.

Her statement "If (Valentin's) car is taken, cd, speakers and box (boom) **are mine**". (Page 8, bottom right)

With this statement in her police report, I respectfully contend that she tried to **steal** my stereo equipment in her **police report** and then tried to implicate me being in **possession** of stolen property at my trial.

The above is another contradictory statement and confirms that Sarah Bower had little or **no** credibility as a witness at my trial.

2) Furthermore, she claims in her police report that I told her the following statement "He ran up in the store with his gun and robbed them of the stuff he had in his car."

According to the police reports **nobody** including **myself** ran up in the store and robbed them and **no** stolen items from the stuff in my car were found.

When cross-examined by Mr. Majchrzak about who had the gun she replied, "Okay, **I don't know in particular which person had the gun**, but I was told they were together." (Page 353, trial transcript)

I respectfully contend that her **above** statement is completely **contradictory** to what she previously said in her **police report** and leads to the question to how any sane person can believe her testimony as to what was really said.

3) Also Mr. Majchrzak knew or should have known that I had given permission to the police to search my car when I was arrested and **no speakers** were **reported stolen** and no stolen items were found or introduced at my trial as **physical evidence**.

4) Again Mr. Majchrzak with reckless disregard to my Constitutional due process rights to a fair trial and due process of law **suborned** the **perjury** of

45

Sarah Bower and **failed to correct it** knowing that her testimony **did not** match with the information in her police reports, the testimony of the store clerk and her police claim that these items **belong** to her.

5) I respectfully contend that Mr. Majchrzak further violated my Constitutional due process civil rights to a fair trial and due process of law when he stated to the jury in his closing argument that Sarah Bower's testimony largely **collaborates** Mr. Kemp's story.

(On page 462, trial transcript) Mr. Majchrzak quotes Ms. Bower as saying about Mr. Valentin "I robbed the store at gunpoint" thereby implying that Kemp and Bower's testimony are in agreement on who was the gunman.

However, she **previously** told Mr. Majchrzak that she **didn't know** who had the **gun**.

I respectfully contend that Mr. Majchrzak had little or no regard to the truth.

As he had before with John Kemp, Mr. Majchrzak built another a **house of cards** with Sarah Bower again using **false** and **misleading** information, **perjured witnesses testimony** and proudly stated to Judge Geraci that **he had no problem with his case proceeding** to trial or stating that **he did not make it a practice** to check on any of his witnesses **criminal records**.

Furthermore, I respectfully contend that if Mr. Majchrzak **did not** make it a practice to check to see if his witnesses' had any criminal histories then he certainly **would not** have check to see if Sarah Bower had a criminal history or a pending criminal charge against her either.

### XVIII. 440.10 Motion on Discovery of Brady Material

In December 2003, I was informed of new information on Sarah Bower regarding her pending criminal action and fugitive status from the Highland Police station the week before my trial.

1) This new information was filed in a Pro Se 440.10 Motion on June 9, 2004 with Judge Geraci. The 440 motion was based on the following grounds: **second**

46

**Brady violation and newly discovered information** regarding the ownership of the car stereo speakers that were used by the trial prosecutor at my trial to support the testimony of his witness, Sarah Bower that **implicated me** being in possession of stolen property. Mr. Rolfe also filed a supporting Affidavit **(Exhibit 17)** to contradict Sarah Bower's testimony about the speakers.

2) On February 4, 2005, Judge Geraci denied my 440.10 Motion without the benefit of a hearing or counsel on the grounds that the **police** and **trial prosecutor** were **unaware** of her fugitive status and the pending criminal action against Sarah Bower.

3) Judge Geraci also made the **same decision** in denying my 330 Motion that the **trial prosecutor** and the **police** were **unaware** of the criminal records of John Kemp despite the fact they were in their **possession and control**. The New York State Appellate Division, Fourth Department later ruled in my appeal, **People v Valentin** that there was a **Brady violation** and the criminal records were in the trial prosecutor's possession and control.

4) Judge Geraci also **ruled** that the owner of my car **could not** prove **ownership** of his factory installed car speakers even though the **owner**, Mr. Rolfe, supplied in his Affidavit a copy of his **Certificate of Title** and **Internet photographs** showing the **factory installed** rear deck speakers.

5) Based on this denial and the fact that Mr. Rolfe felt Judge Geraci's contentions were unsupported by the information he submitted in his first Affidavit, Mr. Rolfe wrote a **second Affidavit** to the New York State Appellate Court in my Leave to Appeal.

6) Mr. Rolfe stated in his second Affidavit that the very **meaning** of the words **factory installed** meant that his speakers were installed in his car at the **factory** and were a **part** of his car just as his **steering wheel** was a **part** of his car.

I respectfully contend that the following information shows clear and convincing evidence that the Sarah Bower's **pending criminal action** regarding the **police reports** that reported her **theft** from Cordello's **were** also **suppressed** by **ADA Majchrzak**, the **Monroe County District Attorney's Office** and the **Rochester Police Department** as follows:

1) Upon information and belief, my source being a police report **(Exhibit 18)** dated January 3, 2001 that **reported** Sarah Bower had an **outstanding warrant request before my trial**.

2) This police report **reports** that Sarah Bower **entered** Cordello's Pizzeria, her **former** place of employment, walked around the counter and **took money** out of the **cash register**. When she was **confronted** with her **theft**, Ms. Bower **ran out** of the store and fled down Monroe Avenue.

3) An employee and eyewitness **filed** a criminal **complaint** with **Officer Hoke** at the **Highland Police Office**.

4) **Officer Hoke** wrote a **warrant request** authorizing her **immediate arrest** on **probable cause**.

5) This **warrant request** and **accusatory instrument** were in the **possession** of the **Rochester Police Department** and the **Rochester City Court** before my **trial**.

6)) Upon information and belief, my source being a police report **(Exhibit 19)** dated on April 27, 2000 and **obtained** through a **FOIL** request from the **Monroe District Attorney's Office**.

 7) This police report dated April 27, 2000 and reported by **Officer Hoke** **shows** that he assisted **Officer Adorante** with the **transport** of **my car** from 15 Harwood Street to the Public Safety Building.

8) **Officer Hoke** also stated that he **drove my car** into the evidence lock up cage. **(Exhibits 18 and 19)** shows that **Officer Hoke** knew or should have known **both** Sarah Bower and me in the performance of his **police duties** at the **Highland Police Office**.

49

9) Upon information and belief, my source being a police **interview** report (**Exhibit 20**) dated April 27, 2000 that was obtained through a **FOIL** request from the **Monroe County District Attorney's Office.**

10) This police **interview** report shows that on April 27, 2000, **Investigator Cotsworth** was at 15 Harwood Street along with **Investigator Walther and Officer Adorante.**

11) (**Exhibit 20**) also shows that **Investigators Cotsworth, Walther and Officer Adorante** took me into **custody** at 18:12 hrs. (**Exhibit 19**) further shows that **Officer Hoke** assisted with the **transport** of **my car** to the Public Safety Building at 18:20 hrs.

12) (**Exhibits 19 and 20**) shows that **Investigator Cotsworth and Officer Hoke were both at 15 Harwood Street on April 27, 2000, at approximately the same time** and **involved in the same arrest incident.**

13) **Investigator Cotsworth and Officer Hoke** also worked **together at the Highland Police Office**, the **same office** that was trying to **arrest** Sarah Bower the week before my trial. In addition, both **Investigator Cotsworth and Officer Hoke** knew **Sarah Bower and me** from their **involvement** in the performance of their **police duties.**

14) **Investigator Cotsworth testified at my trial on January 10, 2001 right after the testimony of Sarah Bower.** Investigator Cotsworth who was a key member of the trial prosecutor's team knew or should have known about Sarah **Bower's fugitive status and pending criminal charge as early as Jan 3, 2001 six days before my trial**. Investigator Cotsworth should have honored his police obligations under Brady and its related **Kyles** ruling and before my trial informed the trial prosecutor of her fugitive status and pending criminal charge.

15) In addition **Investigator Cotsworth** knew or should have known that Sarah Bower was **going** to make an **appearance** to **testify** at my **trial** and he should have **taken** her into **custody** before her **testimony**. I respectfully contend that there is the **reasonable probability** that Investigator Cotsworth **violated**

police **policy** with his **failure** to make an **arrest** when he was **aware** of **her** location.

16) According to the police reports, Sarah Bower **lived and worked** in the **Highland Police Section** and was **well known** to **Investigator Cotsworth** and the **Highland Police Office** from their investigation of her **police statements** she made to **Investigator Cotsworth**, her **altercation** and **theft** from Cordellos and her **fugitive** from the law **status** and **pending** criminal **action** by **his** office.

17) In addition, **five other** police investigators and officers were **directly** involved in my case. These officers were: **Investigators Walther, Keenan, Mace, Murphy and Officer Adorante**. **Investigators Walther, Keenan and Officer Adorante worked** at the **Highland Police Office** with **Officer Hoke and Investigator Cotsworth** and also knew or should have known Sarah Bower and me from their **involvement** in the investigation.

18) Based on the **above information**, I respectfully contend that the **Highland Police Office** through the exchange of information in the **performance** of their **police duties** knew or should have known of Sarah Bower's **theft and fugitive status**. I further contend that this **knowledge** was **imputed** to the **trial prosecutor** and the **Monroe County District Attorney's Office** who knew or should have known of her theft and fugitive status before my **trial.**

The following **information** and **exhibits** further **supports** my contentions on the **suppression** of the Sarah Bower theft information:

1) Upon information and belief, my source being an Assigned Counsel **Claim** Voucher **(Exhibit 21)** dated January 18, 2001 submitted by Jeffrey Regenstrief who was Sarah Bower's material witness lawyer.

2) This document **shows** that Sarah Bower was **arrested** as a material witness and was in the **custody** of the **Rochester Police Department** and the **Monroe County Criminal Justice System on or before** January 5, 2001 four days **before** my trial.

9) Furthermore Mr. Rolfe **states** in his Affidavit that he had a **phone** conversation with **Officer Hoke** on December 9, 2003.

10) Mr. Rolfe asked Officer Hoke why it took so long to arrest Sarah Bower. Officer Hoke told Mr. Rolfe that **he went out looking** for Sarah Bower and it was his belief that **she knew** and **evaded** them to avoid arrest.

11) Officer Hoke also **told** Mr. Rolfe that he **remembered** hearing about the **altercation** incident two weeks before her theft at Cordello's.

12) Upon information and belief, my source being an Affidavit **(Exhibit 25)** dated December 27, 2000 from ADA Majchrzak that **corroborates** in **conjunction** with her **theft** from Cordello's, Sarah Bower's **propensity** for being an inherently **unreliable** witness with a serious **credibility** problem.

13) This document **shows** that Sarah Bower **intentionally** evaded all **attempts** made by the District Attorney's Office to **respond to service** and had to be **arrested** on a material witness charge to **force** her testimony.

14) This Affidavit was also **unknown** to me until my appeal attorney, Mr. Muldoon, **obtained** this document from Judge Geraci's office.

15) Upon information and belief, my source being a Rochester City Court Record **(Exhibit 26)** dated May 8, 2001 that a **Bench Warrant of Arrest** was issued by Judge Theresa Johnson after Sarah Bower **failed** to appear at her next **scheduled** court date on April 24, 2001.

16) Again Sarah Bower was a **fugitive from the law** and **evaded** police arrest until **July 2, 2001**.

17) This document further **corroborates** her **inherent** unreliability as a **credible** and **trustworthy** person.

18) I respectfully contend that ADA Majchrzak, the Monroe County District Attorney's Office and the Rochester Police Department knew or should have known of this **Brady** material that was in their possession and control.

19) I respectfully contend that this **Brady** material on Sarah Bower's **police** and **court records** on her **theft** from Cordello's and **her fugitive from the law status** were never **disclosed** to my **defense** before my **trial**, during my **trial** or after my **trial**.

20) I respectfully contend that the information **contained** in the above paragraphs was a **second Brady violation**, covered under **Brady v Maryland** and its **related rulings** and that the **suppression** of this information **violated** my due process **civil rights** to a **fair trial** and **due process of law** to be free of malicious prosecution and false imprisonment as guaranteed under the **Fifth** and **Fourteenth** Amendments of the United States Constitution.

## XXI. Brady v Maryland

1) In the landmark **Brady v Maryland** ruling and its subsequent **related rulings**, the United States Supreme Court **ruled** that the federal and state governments have an independent **duty** to **disclose** certain **information** to a criminal defendant.

2) The prosecution **violates due process if it suppresses evidence favorable to an accused where the evidence is material either to guilt or to punishment, regardless of the good faith or bad faith of the prosecution**. See Brady v. Maryland, 373 U.S at 87

3) The duty to **disclose** such evidence is **applicable** even though **there has been no request by the accused**. See United States v. Agurs, 427 U.S 97, 107 (1976)

4) The **duty** encompasses **impeachment** evidence as well as **exculpatory** evidence. See United States v. Bagley, 473 U.S. 667, 676 (1985)

5) Such evidence is **material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would**

**have been different."** See <u>Bagley</u>, 473 U.S. at 682; also <u>see Kyles v. Whitley</u>, 514 U.S. 419, 433-434 (1995).

6) Moreover, the **rule** encompasses **evidence "known** only to **police investigators** and **not** to the **prosecutor.** See"<u>Kyles</u>, 514 U.S. at 438.

7) In order to **comply** with <u>**Brady**</u>, therefore, **"the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."** and disclose this information to his **defense.** See <u>Kyles</u>, 514 U.S. at 437.

## XXII. Effect-Sarah Bower's Second Brady Violation-Prejudicial Harm to my Constitutional Civil Rights to a Fair Trial and Due Process of Law

In the following points, I respectfully contend in this Pro Se Complaint that the same **Brady** rules **applies** to the **suppression** of the Sarah Bower theft information by ADA Majchrzak, the Monroe County District Attorney's Office and the Rochester Police Department as follows:

1) At the time of my trial, Sarah Bower was a material witness and also a **fugitive from the law**. This information was **material** to my case, **impeaching** to her **credibility** and **favorable** to my **defense** and **outcome** of my **trial**.

2) The disclosure of this information at the time of my trial would have seriously **damaged** her **credibility**.

3) The **suppression** of this favorable information **undermined** the jury's verdict.

4) My defense did not **possess** the Sarah Bower theft information before my trial nor could it be **obtained** with any **reasonable diligence**.

5) In light of the John Kemp **Brady** violation, the second Sarah Bower **Brady** violation **compounded** the prejudicial damage of the **first**. The cumulative effect dealt a **fatal blow** to **any chance** I had in receiving a fair trial.

6) This information was in the **possession and control** of the Rochester Police Department and the Rochester City Court **before** my trial.

7) The **Rochester Police Department** and the **police members** of ADA Majchrzak's police **team** knew or should have known of Sarah Bower's **theft and fugitive status before** my trial. This **Brady** material and information was **imputed** to **ADA Majchrzak** and the **Monroe County District Attorney's Office** in the performance of their duties.

8) This favorable information was **suppressed** under **Brady** by **ADA Majchrzak**, the **Monroe County District's Attorney's Office** and the **Rochester Police Department irregardless** of their **good faith or bad faith intentions** or if they **knew or didn't know**.

9) The disclosure of her theft information to the jury would have **put** Sarah Bower's **testimony** and **motives** in an entirely different **light** given her material witness status and **inconsistent trial statements** about the stolen property.

10) Sarah Bower's allegations in her police report were **uncorroborated** except by **her word** and reliability as a **credible** person.

11) Sarah Bower stated in her police report (on page 8) if car (Valentin's) was taken by the police, **the speakers, CD player and box (boom) were hers**. These were the same speakers that she alleged were stolen from the stereo store.

12) Inexplicably my defense attorney **never impeached** Sarah Bower on her police **statement** about her **claimed ownership** of these **items** but only on her police statement that she **wanted** her apartment **keys back** after **denying** on the **stand** that **I didn't** have her **apartment keys**.

13) Mr. Rolfe told me that he had also talked to **Investigator Walther**, the police officer who I gave permission to **search** my car.

14) In his **conversation** with Investigator Walther, Mr. Rolfe **inquired** about the **location** of his **missing** stereo equipment and about the **alleged** home invasion that Sarah Bower **initially** accused me of.

15) Investigator Walther told Mr. Rolfe that **these** people (Sarah Bower's friends) were **into drugs** and **not credible**.

16) Furthermore **before** my trial I **told** my defense attorney about Sarah Bower's **drug use** and that she had **told** me that she had undergone **rehab** for a **crack addiction**. Again my defense lawyer did not **impeach** her on this information.

17) In addition, there was a **reasonable probability** that had Judge Geraci **granted** an evidentiary hearing, I could have called Sarah Bower's former **employer** Mr. Cordello **as a witness** to explore the **reasonable** probability if she was **fired** for employee **theft** to **support** her drug use.

18) This **reasonable** probability is based on the comments **regarding** her **character** that were made by Mr. Cordello to Mr. Rolfe in their telephone conversation on December 8, 2003 and also contained in **(Exhibit 17)**.

19) The **suppression** of this information **denied** my defense the **opportunity** to **impeach** Sarah Bower on this information and **allowed** her to **testify** with **impunity** that she was a **credible** person.

20) The suppression of this information also **denied** my defense of any **opportunity** to open up **additional** lines of **questioning**.

21) Had this information been **disclosed** to my defense, there was the **reasonable probability** that the **outcome** of my **trial** would have been **different**.

22) I further contend that Sarah Bower's pending criminal action, arrest, prosecution and conviction were **certainly** in the **possession** of the **Monroe County District Attorney's Office** and was **never disclosed** to me **after** my trial.

23) The **suppression** of this information **prevented** my defense from **raising** the Sarah Bower **theft matter** in my **330 Motion** and **Appeal** and **prejudiced** my **due process right** to a **post** conviction **fair** proceeding.

24) The above prejudicial **damage** was evident at my November 20, 2003 Appellate hearing when Justice Elizabeth Pine who did not know of Sarah Bower's pending criminal charge asked Mr. Muldoon, **"Did Sarah Bower have a**

**record?"** Mr. Muldoon who also **did not know** of Sarah Bower's theft could only reply that she was a **material** witness.

25) Mr. and Mrs. Rolfe who attended my appeal hearing and were hopeful that I would win from the severe **prejudicial** damage caused by John Kemp **alone** realized from Justice Pine's sharp **question** to Mr. Muldoon that I had just **lost my appeal**.

26) In addition, the **cumulative** effect of both **Brady** violations **prejudiced** any **chance** I had in receiving a fair trial, **fair due process of law** post conviction 330 Hearing and New York State Appellate Appeal proceeding.

27) I also contend that if the jury, Judge Geraci in my 330 motion and in my **appeal** to the New York State Appellate Court **had known** of Sarah Bower's pending criminal action and theft from Cordello's, Sarah Bower's **credibility** would have been severely undermined and a **reasonable probability** existed that the **outcome** of my **trial, 330 motion** and **appeal** would have been **different**.

28) I respectfully contend that as a result of the **suppression** by Mr. Majchrzak and the Rochester Police Department of **both** John Kemp's **criminal records** and Sarah Bower's **pending criminal action**, my Constitutional civil right to a **fair trial** and **due process of law** were dealt a **fatal blow** to **any chance** I had in **receiving** a **fair trial** and **due process of law**.

### XXIII. Habeas Corpus Grant

On April 28, 2005, I filed a Petition for a Writ of Habeas Corpus under 28 U.S.C 2254 with the Federal Court Western District of New York. On January 10, 2011, the Honorable Magistrate Judge Victor Bianchini **granted Habeas Relief** and **ruled** that there was a **Brady** violation on the ADA's **suppression** of John Kemp criminal records.

Magistrate Judge Bianchini also ruled that it was **material** to the **outcome of my trial** and the **suppression** of John Kemp's criminal records **violated** my **Constitutional** due process **civil rights** to a **fair trial** and **due process of law**.

Magistrate Judge Bianchini also **ordered** that my **convictions** be **expunged**.

The Monroe County District Attorney's Office **did not** file a **timely notice of appeal** to the Federal 2nd Circuit Court in New York City **appealing** Magistrate Judge Bianchini's Decision and Order on my Habeas Corpus Grant.

### XXIV. Conclusion

In conclusion, I respectfully contend from the information contained in this Pro Se Complaint that **everything** favorable and **material** to my defense and the **outcome** of my trial including the criminal records of John Kemp, Terrance McLaurin and the pending criminal action against Sarah Bower both **before** and **after** my trial was **suppressed** by the **illegal actions** of **ADA Mr. Majchrzak** and the other named **defendants** in this Complaint who are employed or were formerly employed by the Monroe County District Attorney's Office and the Rochester Police Department.

I respectfully contend that ADA Mr. Majchrzak **acted** in **the role** and **assumed** the **duties** of a **police investigator** in the prosecution of my case and the related Arroyo case and thereby **lost** his absolute **immunity** from litigation in this Complaint.

I respectfully contend that ADA Mr. Majchrzak acted with **reckless** disregard, used **perjured** witnesses' testimony, made **false** and **misleading** statements and evidence against me at my trial and **engaged** in a **deliberate act** of **malicious prosecution** that he knew or should have known would **lead** to my **false imprisonment** and **deprivation** of my **liberty** for **six** years.

I respectfully contend that all parties listed above and named as defendants in this Pro Se Complaint also acted with **reckless** disregard under the **color of law**

62

and **committed illegal actions** involving one or more **Brady** violations, **participated in** and or **supported** ADA Majchrzak's **illegal actions** in his **malicious prosecution** and **false imprisonment** against me that **deprived** of my **liberty** for **six** years.

I also respectfully contend that all named **defendants** in this Complaint through their **illegal** actions **deprived** me of my **Constitutional civil rights** to a **fair trial** and **due process of law** and protection from **malicious prosecution** and **false imprisonment** as guaranteed under the **Fifth** and **Fourteenth** Amendments of the United States Constitution.

As a result of the above **illegal actions** by the named **defendants** in this Pro Se Complaint that led to my **false imprisonment** and **loss liberty**, I **suffered extreme** emotional-physical pain and suffering **involving six years loss of liberty** under harsh conditions, five years of **supervised** probation, a **current painful** and **persistent back injury** that I **sustained** in **prison**, extreme **damage** to my **name and reputation**, **loss of affection** from **my children**, loss of **income**, loss of **work opportunities** and **job loss** from background checks.

I respectfully contend that the **submission** of this Complaint before your Court will show **clear** and **convincing** evidence to **support** my **claims'** that the **illegal actions** of the named **defendants** in this Complaint knew or should have known of the **Brady** material that was in their **possession** and **control** and **disclosed** this information to my **defense**.

I respectfully contend that the defendant's **illegal actions** in the **suppression** of this **Brady** material that was **favorable** to my defense and **material** to the **outcome** of my trial violated my **Constitutional** due process civil rights and **deprived** me of any **chance** of receiving a **fair trial** and **due process of law**.

I respectfully petition this **Federal Court** to **review** my Complaint on its **merits** and **award** just and reasonable **damages** based on what the court or jury may see fit to **redress** the multiple **civil rights violations** that **I suffered** from the **illegal actions** of the named **defendants** documented in this Complaint that **deprived** me of my **freedom** and **loss of liberty** for **six** years.

63

Dated: April 29, 2011

Hector Valentin Pro Se
Plaintiff
4084 Dewey Avenue
Rochester, New York 14616

Sworn to before me this 29th
Day April 2011

ANDREA T. MARSOCCI
Notary Public, State of New York
Qualified in Monroe County
No. 01MA6229730
My Commission Expires 10/18/2014

64