UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HECTOR L. VALENTIN,

        Plaintiff

   v.                                                                                                    **MEMORANDUM OF LAW**

CITY OF ROCHESTER, CHIEF OF POLICE
JAMES SHEPPARD, DAVID MOORE, Former
Chief of Police, ROCHESTER POLICE
DEPARTMENT, MICHAEL COTSWORTH,
Rochester Police Department Officer/Investigator,      **11-cv-6238 (CJS)**
INVESTIGATOR DAVE MACE, INVESTIGATOR
JOSEPH MURPHY, INVESTIGATOR BLAHO,
OFFICER ADORANTE, OFFICER HOLMES,
HOKE, Former Rochester Police Department
Officer, MONROE COUNTY, MONROE COUNTY
DISTRICT ATTORNEY'S OFFICE, MICHAEL
GREEN, Monroe County District Attorney HOWARD
RELIN, Former Monroe County District Attorney,
DANIEL MAJCHRZAK, Former Monroe County
Assistant District Attorney, PATRICK FIERRO, Monroe
County Assistant District Attorney,  JOHN MUNRO,
Monroe County Assistant District Attorney, JOHN
MARCHIONI,  Monroe County Assistant District
Attorney, MS. WENDY SISCA, Monroe County
District Attorney's Office Employee, INVESTIGATOR
CASPER CACECI, Monroe County District Attorney's
Office Employee,

        Defendants.

_____

    Plaintiff HECTOR L. VALENTIN, by and through undersigned counsel, respectfully submits the following Memorandum of Law in support of his motion for reconsideration pursuant to F.R.Civ. P. 59(e) and other relief.  Exhibits referred to are annexed to and identified in the accompanying Declaration of JOHN M. REGAN, JR., ESQ.

## I.  FACTS

In the interest of not taxing the Court's patience with a review of well worn territory, we assume that the Court has at least as much familiarity with the underlying facts of this case as it has presumed the readers of its October 24th Decision and Order to have.

We ask the Court to bear in mind in considering what follows that undersigned counsel was retained by the Plaintiff after the Court's October 24th decision - indeed, under the circumstances well after, those circumstances being that the relief sought through this motion had to be sought within 28 days of the Court's judgment under F.R.Civ.P. 59(e) in order to preserve important appeal rights for the Plaintiff.  This has been a formidable task in a case that has over 150 docket entries spanning 7 years and involves two of the most complex areas of federal law that exist:  namely, private civil rights actions under 42 U.S.C. §1983 and the rights of criminal Defendants under Brady v. Maryland, 373 U.S. 83 (1963)  Undersigned counsel has not been able, in the time allotted, to be as thorough as he would like in these submissions regarding the specific allegations against each Defendant.  This is one reason oral argument on this motion is requested.

## II.  SUMMARY OF THE ARGUMENT

First, the presence in this case of a Monell[1] claim against Defendant County of Monroe ("County") based upon a widespread, continuous and long-standing policy and practice of the Monroe County District Attorney's office in ignoring its constitutional obligations pursuant to Brady v. Maryland, 373 US 83 (1963) poses a significant challenge to this Court's impartiality, as a long time and high ranking official of that very office, personally and professionally devoted to some of the named Defendants in this case.  For this reason we contend that the Court must vacate its judgment and recuse itself from further proceedings in this case.

---

1   A claim against a municipality for violation of federal rights under Monell v. Department of Social Services, 438 US 658 (1978)

Second, the Court's reasoning in its Decision and Order that Brady[2] violations can be bifurcated into two categories - intentional and inadvertent - with only the former providing a basis for a damages claim under 42 U.S.C. §1983 against police officers - is ultimately untenable.  It inverts the basic understanding of the Brady decision itself, which specifically renounced the very distinction the Court makes, and while the Court's position may be the subject of some controversy in other circuits, it has no support in precedential opinions from the 2nd circuit or the Supreme Court.

Third, the Court missed an important due process issue plainly presented by the record:  namely, the fundamental due process violation stemming from the prosecutor's undisputed use of inconsistent theories to obtain the Plaintiff's criminal conviction.

Plaintiff accordingly asks:  a) that the Court vacate the judgment entered October 25th and the Decision and Order of October 24th on which it is based, recuse itself and direct the clerk of the court to assign another judge to preside over this case; or, in the alternative, b) oral argument on this motion and c)  that the Court thereafter entirely reconsider its October 24th Decision and Order and the ensuing judgment pursuant to F.R.Civ.P. 59(e), reinstate this action against all Defendants and hold a conference to determine a schedule for further proceedings now that the Plaintiff, who previously prosecuted this action *pro se*, is represented by counsel.

### III.  ARGUMENT

### A. RECUSAL

As is by now well known to the Court, the Plaintiff prevailed on his petition for habeas corpus in this Court (05-cv-0298, WDNY) by virtue of a finding by the habeas court that a flagrant Brady violation had materially contributed to his conviction.  Specifically, the habeas court found that the prosecutor at Plaintiff's trial had suppressed the criminal conviction record of one of the chief witnesses

---
[2]  Brady v. Maryland, 373 US 83 (1963)  This memorandum will frequently reference this case, hereafter solely as "Brady"

against the Plaintiff, an individual named John Kemp.

As those familiar with this area of practice know and studies have demonstrated,[3] outside of a death penalty context habeas relief by a federal court to a state prisoner is exceedingly rare. But perhaps even more remarkable here is the state court record on which that relief was granted, which demonstrated *through the prosecutor's own words* a "custom, policy or practice" on the part of the Monroe County District Attorney's office that is completely incompatible with prosecutors' constitutional obligations under Brady. It is worth quoting at length from the transcript of the exchange (**Exhibit "A"**) between then Monroe County Court Judge (now WDNY Judge) Geraci and Defendant-prosecutor Daniel Majchrzak that took place on March 7th, 2001 (emphasis supplied):

> COURT: And Mr. Kemp testified before this Court. It turned out subsequently he was convicted of a felony or two felonies.
>
> MR. MAJCHRZAK: Two felonies according to the NYSSIS report
>
> COURT: And three misdemeanors.
>
> MR. MAJCHRZAK: Correct.
>
> COURT: And you didn't know anything about that?
>
> MR. MAJCHRZAK: No, your honor, and that's not even acknowledged by Mr. Bertram [sic].
>
> COURT: Why didn't you know anything about that?
>
> MR. MAJCHRZAK: *Because, your honor, I did not run a NYSSID report on my witness*.
>
> COURT: Why?
>
> MR. MAJCHRZAK: *I just don't*.
>
> COURT: You don't want to know that?
>
> MR. MAJCHRZAK: Well, your honor, *the practice that I have and that all of the assistant district attorneys up through our administration have is that if we have reason to believe somebody has been arrested or has a conviction, then it's incumbent on us to use due diligence*

---

[3] **King, Nancy J. and Hoffmann, Joseph L., Habeas for the Twenty-First Century, University of Chicago Press, 2011**. Professors King and Hoffman estimated that outside of death penalty cases, federal habeas relief was granted to state prisoners at a rate of less than four tenths of one percent.

*to find that information, but with Mr. Kemp...*

COURT:  He was convicted by your office, prosecuted by your office within a year.

MR. MAJCHRZAK:  Right, Judge.

COURT:  The last year.

MR. MAJCHRZAK:  And I guess the difference here is actual knowledge versus imputed knowledge.

*          *          *

COURT:  And you don't want to know whether or not he has a criminal history in preparation for your case?

MR. MAJCHRZAK:  *Judge, I don't make it a practice to find the information.  It's not that I don't want to know or did want to know.*

COURT:  Wouldn't that be a little disturbing of a surprise [sic] if the defense attorney asks him if he's been convicted twice of a felony and three times of misdemeanors, that that doesn't concern you?

MR. MAJCHRZAK:  Well, Judge, it may be to my peril but it doesn't rise to the level of a violation under 330 and under our obligations under Brady.  There's a difference.

Of course, in this exchange the prosecutor betrays not only an appalling ignorance of his obligations under Brady and its progeny; he also explicitly ascribes this failure to the policy and practices of the Monroe County District Attorney's office, circa 2001.[4]  The significance of this evidence cannot be overstated:  the prosecutor is, of course, absolutely immune under present law [see, Imbler v. Pachtman, 424 US 409 (1976)], but if his incompetence (or worse) can be attributed to an office custom, policy or practice of the Monroe County District Attorney's office then Defendant County of Monroe is liable to the Plaintiff for damages under Monell.

---

4  At least since 1976, prosecutors have been required to voluntarily turn favorable evidence in their possession over to the defendant regardless of whether it was specifically requested.  United States v. Agurs, 427 US 97 (1976)  Since at least 1985, "favorable" evidence has included impeachment evidence as well as directly exculpatory evidence.  United States v. Bagley, 473 US  667, 676-677 This case concerns, of course, impeachment evidence regarding the two most critical witnesses used by the prosecutor at trial to obtain the Plaintiff's conviction, and in the face of Agurs and Bagley Mr. Majchrzak - astonishingly - maintains that he simply doesn't look for such evidence, even though (as the Court went to some length to point out in its October 24th Decision and Order at pp. 28 to 29) he has unfettered electronic access to it through the "DCJS" data base.

Obviously, however, a <u>Monell</u> claim of this nature implies widespread and serious malfeasance in an office, and by a supervisor, that are by common knowledge in this District too familiar to this Court, notwithstanding the lapse in time between the events complained of and the Court's tenure in the office. We have great respect for, and tremendous confidence in, this Court's fairness and impartiality. But that confidence is not limitless. We accordingly submit that this case should be assigned to another judge and regretfully so request.

### B. BRADY VIOLATIONS AND DAMAGES UNDER 42 U.S.C. §1983 ("§1983")

1. <u>THE CORRECT STANDARD IN THIS CIRCUIT GOVERNING POLICE OFFICER LIABILITY FOR A BRADY VIOLATION IN A §1983 CASE IS STRICT LIABILITY</u>

In its Decision and Order of October 24th, the Court makes much of a 2016 non-precedential summary order from a panel of the 2nd Circuit [viz., <u>Fappiano v. City of New York</u>, 640 Fed. App'x 115 (2nd Cir., 2016)] in firmly concluding, as a matter of law, that a cause of action for damages under §1983 based upon a Brady violation by police (as opposed to prosecutors) will lie only for *intentional* conduct in suppressing Brady material. This conclusion is incorrect. In this circuit Brady violations remain a strict liability offense, regardless of whether the context is a §1983 action or a habeas corpus action, and regardless of whether the offender is a prosecutor or a police officer, although a prosecutor is absolutely immune for the violation.[5]

It is true that there has been some controversy in other circuits over this question. The courts that have leaned in the direction this Court took in its October 24th Decision and Order have reasoned roughly as follows: while Brady itself is a "no-fault" or "strict liability" due process obligation - meaning that a Brady violation can occur unintentionally - the Supreme Court held in <u>Daniels v.</u>

---

5   It is worth mentioning that a case from the EDNY post dating <u>Fappiano</u> noted that the "scienter" requirement, if any, for police officer Brady liability under §1983 has not been determined either by the 2nd circuit or the Supreme Court. Nnodimele v. DiRienzo, 13-cv-3461 (EDNY, June 27th, 2016)  The <u>Bellamy</u> case, decided in 2017, also from the EDNY and (perhaps selectively) cited by this Court's Decision and Order as "authority" to the contrary, was appealed to the 2nd circuit and submitted for a decision that has not yet been rendered, at least as of this writing.

6

Williams, 474 US 327 (1986) that a §1983 action grounded in a due process deprivation must involve conduct that is intentional and not just negligent; and in Arizona v. Youngblood, 488 US 51 (1988) the Supreme Court held that the destruction of *potentially* exculpatory evidence by police would not constitute a due process violation unless it was *intended* to deprive a criminal defendant of the chance to use that evidence to prove his innocence.  See, e.g., Jean v. Collins, 221 F.3d 656, 660-661 (4th Cir., 2000)(en banc); see also, Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir., 2004); Tennison v. City and County of San Francisco, 570 F.3d 1078, 1087-1089 (9th Cir., 2008)(holding that the correct standard for §1983 police officer liability is "recklessness" or "deliberate indifference", not "bad faith")

Aside from the non-precedential Fappiano case that this Court for some reason followed as if it was the law, however, neither the Supreme Court nor the 2nd circuit has ever followed this line of reasoning, which is fortunate:  it is a flimsy argument that seeks to indirectly, but fundamentally, limit the explicit command of the Supreme Court in Brady.

As numerous courts including the Supreme Court have long noted, and as the Brady case itself unmistakably provided, a prosecutor's constitutional due process obligation to turn over exculpatory or impeachment material to a criminal defendant is a "no-fault" or strict liability obligation.  Haley v. City of Boston, 657 F.3d 39, 48 (1st Cir., 2011); Porter v. White, 483 F.3d 1294, 1305 (11th Cir., 2007), citing Strickler v. Greene, 527 US 263, 288 (1999)("...inadvertent nondisclosure has the same impact in the fairness of the proceedings as deliberate concealment.") and United States v. Agurs, 427 US 97, 110 (1976)(the "character of the evidence, not the character of the prosecutor" is the Brady issue)  It is precisely because this no-fault standard was a departure from traditional due process territory - that is, dealing with *intentional* deprivations of life, liberty or property [e.g., Mooney v. Holohan, 294 US 103 (1935), specifically cited in Brady)] - that the Brady court was so explicit ("We now hold that the suppression by the prosecution of evidence favorable to an accused ...violates due process...*irrespective of the good faith or bad faith of the prosecution*.")(373 US at 87)(emphasis supplied)

7

Accordingly, there is no merit to the argument that the Supreme Court's decision in Daniels limits §1983 actions based on Brady due process claims to so-called "intentional" violations. Daniels involved what was essentially a "slip and fall" tort action that took place in a prison. It had nothing to do with Brady and did not even cite the case. It can't possibly be interpreted as *limiting* it.

Similarly, Arizona v. Youngblood has nothing to say about Brady violations requiring intentional misconduct to support a damages action under §1983 for two reasons perhaps even more fundamental: a) it was not a §1983 action; and b) it did not involve a Brady violation proper, but only "access" to evidence that *might* be exculpatory if it was scientifically tested.

Beyond that, any argument that the Brady obligation is different in §1983 actions than in some other context runs afoul of the familiar principle that §1983 is not the source of the substantive rights to be vindicated but simply the mechanism provided for their vindication. Chapman v. Houston Welfare Rights Org., 441 US 600, 617 (1979)("One cannot go into court and claim 'a violation of §1983', for §1983 by itself does not protect anyone from anything"); quoted in Gonzaga University v. Doe, 536 US 273, 285 (2002)  That is, the §1983 action is the source of the *remedy*, not the right. Put differently, the nature of the right involved cannot be altered simply because it arises in a §1983 action as opposed to, say, a habeas corpus action.

In sum, a Brady violation is defined by the Brady case and its progeny, not §1983 actions that are based on due process generally but have nothing to do with Brady - as in Daniels - or Supreme Court cases declining to extend the Brady obligation to evidence that is only potentially exculpatory, as in Youngblood.

2. A SHOWING OF SPECIFIC INTENT ("BAD FAITH") FOR POLICE OFFICER §1983 BRADY VIOLATIONS IS NOT REQUIRED UNDER THE CASE LAW OF *ANY* CIRCUIT

The foregoing aside, even those courts erroneously grafting an intentionality requirement onto §1983 actions against police officers have not gone so far as this Court apparently did here - that is,

holding that in order to be liable in a §1983 action under Brady a police officer must have the *specific intent* to deprive a criminal defendant of valuable evidence in his favor. Instead, these courts have adopted a "recklessness" or "deliberate indifference" standard. See Jean v. Collins, supra, 221 F.3d at 660-661 and Tennison, supra, 570 F.3d at 1087-1089 Accordingly, even if this Court is inclined to disregard the precedents that actually bind it - e.g., Brady itself and Kyles v. Whitley, 514 US 419 (1995) - in favor of precedential cases from some other circuit that are more in agreement with this Court's sentiments on the matter, the Court still could not do what it did here and absolve all the police officer defendants of liability under Brady on the theory that no showing of specific intent has been made.

3. APPLYING THE CORRECT STANDARD HERE

a) The Monell claims against the County of Monroe and the City of Rochester

The Plaintiff was the victim of a Brady violation that was a substantial factor in bringing about his criminal conviction. This very Court previously so held in a habeas corpus action. Valentin v. Mazzuca, 05-cv-0298 (WDNY, 2009) This violation was committed by the prosecutor in the case, Daniel Majchrzak, by withholding the criminal conviction record of John Kemp at Plaintiff's trial.

Under current law Mr. Majchrzak is, of course, absolutely immune from a suit for damages for the violation. But since he essentially confessed in open court that his conduct in suppressing the evidence of Kemp's criminal record was consistent with an official practice and policy of the Monroe County District Attorney's office at the time (See section III-A, above)(**Exhibit "A"**), Defendant County of Monroe is liable for Majchrzak's Brady violation under Monell, and this Court erred in dismissing that claim. Moreover, upon information and belief, the Monroe County District Attorney's office as a whole is, and has been, deliberately indifferent as a matter of policy and practice to the due process violation of using inconsistent theories when prosecuting two or more individuals in

9

connection with the same crime.  Pyle v. Kansas, 317 US 213, 214 (1942); but see, Bradshaw v. Stumpf, 545 US 175, 186-187 and 190 (2005)  The prosecutor also committed this "Pyle" violation as a matter of record in this case by claiming through Kemp's testimony that the Plaintiff was the gunman in the robbery, whereas to obtain the indictment of co-Defendant Arroyo he had offered testimony that Arroyo was the gunman.

Alternatively, should the Court decide that Plaintiff's Monell claims against the County through the named District Attorneys are precluded by the Supreme Court's decision in Connick v. Thompson, 563 US 51 (2011) we suggest, in order to preserve our right to appeal on these issues, that the Supreme Court must reconsider its doctrine of absolute immunity for prosecutors under Imbler v. Pachtman, 424 US 409 (1976)

As for the Defendant City of Rochester, it has likewise - and somewhat astonishingly - judicially admitted to a policy and practice of simply not training its police department regarding police officer Brady obligations (**Exhibit "B"**).  The justification for this policy and practice, apparently, is the flagrantly wrong notion that only prosecutors have obligations under Brady, not police officers.  Accordingly, this Court erred in dismissing the Monell claim against Defendant City of Rochester.

      b) Plaintiff's claims pursuant to Brady v. Maryland

        i) The Kemp Brady issue

It is true that police discharge their Brady responsibilities by turning exculpatory and impeachment materials over to prosecutors and that it is the prosecutors' responsibility to disclose that evidence to the defense.  It is also true, as the Court pointed out in its Decision and Order, that the prosecutor in this case had access to Kemp's criminal record on his own, entirely independent of any of the police officer defendants

But there is more to it than the simple fact of Kemp's criminal convictions.  For example, Officers Mace, Murphy, Cotsworth and Wehr have knowledge of the details surrounding one or more

of those convictions, including such probative matters as a 1999 mental health arrest of Mr. Kemp.

We submit that impeachment information of this nature was in the possession of the police officer defendants but *not* within the knowledge of the prosecutor, and that by not providing this information to the prosecutor these officers violated their Brady obligations to the Plaintiff.

ii) The Sarah Bower Brady issue[6]

The habeas court's conclusion that the failure to inform Plaintiff's defense of the January 3rd, 2001 petit larceny charge of Sarah Bower did not constitute a Brady violation is perplexing. Under the federal Brady standard this was impeachment evidence against a critical prosecution witness that plainly fell under Brady's reach. It is difficult to understand how the habeas court came to the conclusion that under *state* law, which is subordinate to federal law, this evidence somehow could not have been used to impeach Bower. And the habeas court does not appear to have been correct in its interpretation of state law in any event. People v. Sorge, 301 NY 98 (1950)

Moreover, this petit larceny charge occurred within a few days of Plaintiff's scheduled trial, and after what can only be described as a rather intense "manhunt" that had continued for at least a week prior (**Exhibit "C"**). It also came one day after the prosecutor finally obtained a material witness warrant for Bowers' arrest (**Exhibit "D"**).

Most significantly, the charge stems from an incident supposedly taking place at 4 o'clock in the afternoon on January 3rd at Bowers' former place of employment that was "investigated" by Defendant Officer Hoke (**Exhibit "E"**), and apparently resulted in a phone call to Defendant Caeci from Bowers' boyfriend *within a few hours* "guaranteeing" that the up-to-this-point extremely reluctant and even fleeing Bowers would be in court to testify (**Exhibit "F"**).[7]

---

6  In its October 24th Decision and Order, the Court claimed, in footnote 57, that the Plaintiff is collaterally estopped from raising this issue because the habeas court ruled against him on it. Without treating this contention at length at this juncture, we nevertheless note that to our knowledge collateral estoppel is an equitable doctrine that cannot be raised sua sponte and that numerous conditions apply before invoking it, none of which the Court considered in its footnote.

7  Proximity in time between related events, at least in other contexts, at the very least permits an inference of causation.

Certainly Officer Hoke, who was involved *both* in Plaintiff's arrest on April 24th, 2000 (**Exhibit "G"**) and was in fact the sole police officer who initiated this charge, had a Brady obligation to inform the prosecutor of this suspiciously contemporaneous charge against Bowers, who was already the subject of both subpeonas and a material witness order in connection with Plaintiff's trial. He failed to do so, and so did any other officers in the same department who had involvement with Plaintiff's prosecution.

This Court erred, therefore, in dismissing the claims against these officers.

c) <u>The prosecutorial inconsistency due process violation under Pyle v. Kansas</u>

Arising from the same crime as Plaintiff was convicted of, Prosecutor Majchrzak obtained an indictment of another person, Jose Arroyo, by eliciting testimony before the grand jury that Arroyo had been the gunman for the holdup. At the Plaintiff's trial, Prosecutor Majchrzak elicited testimony from witness John Kemp that the Plaintiff, and not Arroyo, had been the gunman. This inconsistency troubled the state trial judge, but not Majchrzak:

> COURT: Fairness. Let's talk about fairness. There has to be some question in your mind regarding that testimony [Kemp's] when you have testimony in the Grand Jury from the other eyewitness that the other person possessed the gun. Now this witness says this defendant possessed the gun and you don't want to inquire into that witness regarding his background and regarding his veracity. Isn't that your obligation as a prosecutor?
>
> MR. MAJCHRZAK: I disagree, Judge, with the assumption that we have to run RAP sheets when the statute specifically says we don't.
>
> COURT: Don't you have to test the veracity of the statement made to you when you have direct contrary information from the other eyewitness. Don't you think you would have an obligation to do that?
>
> MR. MAJCHRZAK: Your honor, with all due respect, that situation is very common in cases of this nature. When crimes of violence happen in a short period of time, it's - - I've had many cases where witnesses disagreed as to substantive aspects of the case and it doesn't mean that if there is a disagreement, I'm going to start running RAP sheets on witnesses.

---

<u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 720 (2nd Cir., 2002); see also, Linares v. Mahunik, No. 05-cv-0625, 2006 WL 2595200 at 10 (NDNY, 2006)  Indeed, there are far more serious - perhaps even sinister - implications to a causal relationship between Bowers' arrest for petit larceny and her testimony against the Plaintiff.

12

COURT: This is not a minor disagreement. This goes to the very heart of this case. This is the significant factor regarding who walked in that store and who possessed the gun, isn't that a significant difference between what you had presented to a grand jury, and what you had a trial jury hear in this courtroom?[8]

This is an area of the law of due process that has become enormously confused. It would seem that Pyle v. Kansas settled the issue of prosecutorial inconsistency in 1942, concluding unanimously that prosecutors could not, while observing their solemn duty to afford defendants due process of law, pursue inconsistent theories of the same case in order to win more convictions.

But in the late 1990's the 9th circuit became embroiled over precisely such a case. First, in Thompson v. Calderon, 109 F.3d 1358 (9th Cir., 1996) a three judge panel reversed a District Court's grant of habeas relief to Thompson, a death row inmate. The case was then heard en banc, with the whole court reversing the three judge panel and granting the writ. Thompson v. Calderon, 120 F.3d 1045 (9th Cir., 1997) Judge Kozinski wrote a dissent from the en banc opinion in which he nevertheless fretted at length about the prosecution's lamentable use of inconsistent theories to secure Thompson's death sentence. Thompson, 120 F.3d 1070-1072 (Kozinski, J., dissenting)

Neither 9th circuit Thompson case cited Pyle in any of its many opinions.

The Supreme Court then took up the case on certiorari and reversed the en banc 9th circuit. Calderon v. Thompson, 523 US 538 (1998) None of the Supreme Court opinions cited Pyle either and not one of the Justices seemed troubled by the prosecutorial inconsistency. Later, Justice Thomas wrote a concurring opinion joined by Justice Scalia in Bradshaw v. Stumpf, 545 US 175, 190 (2005) (Thomas, J. concurring) where he confidently - if wrongly - declared that "This Court has never hinted, much less held, that the Due Process clause prevents a State from prosecuting defendants based on inconsistent theories." None of the opinions in Bradshaw, of course, cited Pyle either.

---

8  It should be noted that there was additional discussion between Judge Geraci and Mr. Majchrzak in which the latter ably defended his integrity and honesty, arguing that he had tried to put a transcript of the inconsistent grand jury testimony before the trial jury but was barred from doing so by the Judge Geraci. Even so, Judge Geraci also went on to indicate that he was very bothered by the inconsistency and the prosecutor's conduct.

Here, prosecutor-defendant Majchrzak obtained Plaintiff's conviction by advancing at Plaintiff's trial an account of the crime that was inconsistent with, and more serious than, the account he had earlier advanced to obtain another man's indictment.

We submit that <u>Pyle</u> is good law unless and until it is explicitly overruled by the Supreme Court, and further submit that <u>Monell</u> liability attaches to supervisors and the County over the prosecutors conduct.  In the alternative, we request on reconsideration that the Court render a declaratory judgment in our favor on this issue.  Finally, recognizing that this Court is bound by precedent, we submit that on any appeal from the denial of this relief we seek the abolition of absolute prosecutor immunity from suits under §1983 for damages under the circumstances presented.

## **CONCLUSION**

Based on all the foregoing, Plaintiff respectfully submits that the relief requested in the Notice of Motion should be granted, or any alternative relief, and such other, further and different relief which to the Court seems just, equitable and proper.

Dated:  November 21, 2018

<u>//s// John M. Regan, Jr.</u>
JOHN M. REGAN, JR., ESQ.
Attorney for Appellant
HECTOR L. VALENTIN
Office and Post Office Address
1100 University Ave., Suite 209
Rochester, NY   14607
Tel:    585.568.9553
Fax:    585.271.1415
email:  strikelawyer@gmail.com
